OPINION
{¶ 1} Although originally placed on our accelerated calendar, we have elected, pursuant to Local Rule 12(5), to issue a full opinion in lieu of a judgment entry. The defendant-appellant, Marty L. Eberly, appeals the judgment of conviction and sentencing of the Upper Sandusky Municipal Court, Wyandot County, Ohio.
 {¶ 2} On September 9, 2003, the appellant plead not guilty to one count of domestic violence under R.C. 2919.25(A). This charge stemmed from a series of incidents that occurred on August 18 — 19, 2003, wherein appellant's then-girlfriend, Julia Barth, informed the police that appellant had assaulted her in the apartment they shared, threatened her, and forbid her from having contact with her family and friends.
 {¶ 3} A bench trial was held on December 22, 2003. During the trial, Julia testified to the events including and leading up to the assault, and two officers testified to the arrest. Appellant did not testify, nor did he put on a defense. Appellant was found guilty on the charge of domestic violence and the matter then proceeded to a sentencing hearing on January 28, 2004. This appeal followed, and the appellant now asserts one assignment of error.
The verdict was against the manifest weight of the evidence.
 {¶ 4} Although appellant has asserted as the lone assignment of error that the finding of guilt was against the manifest weight of the evidence, the arguments in the brief appear to challenge the sufficiency of the evidence as well. Therefore, we will address each of these claims.
 {¶ 5} The Ohio Supreme Court has set forth a test to determine whether the evidence submitted in a trial was sufficient for the trier of fact to determine a crime had been proven beyond a reasonable doubt. See State v. Jenks (1991),61 Ohio St.3d 259. In Jenks, the Court outlined the sufficiency of the evidence test as follows:
An appellate court's function when reviewing the sufficiencyof the evidence to support a criminal conviction is to examinethe evidence admitted at trial to determine whether suchevidence, if believed, would convince the average mind of thedefendant's guilt beyond a reasonable doubt. The relevant inquiryis whether, after viewing the evidence in a light most favorableto the prosecution, any rational trier of fact could have foundthe essential elements of the crime proven beyond a reasonabledoubt.
Id. at paragraph two of the syllabus.
 {¶ 6} In contrast, when reviewing whether the trial court judgment was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541. In doing so, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether "the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Adkins (Sept. 24, 1999), Hancock App. No. 5-97-31, 1999 WL 797144, unreported, citing State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717;Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541.
 {¶ 7} In making this determination, the Ohio Supreme Court has outlined eight factors for consideration, which include "whether the evidence was uncontradicted, whether a witness was impeached, what was not proved, that the reviewing court is not required to accept the incredible as true, the certainty of the evidence, the reliability of the evidence, whether a witness' testimony is self-serving, and whether the evidence is vague, uncertain, conflicting, or fragmentary." State v. Apanovitch
(1987), 33 Ohio St.3d 19, 23 — 24, 514 N.E.2d 394, citing Statev. Mattison (1985), 23 Ohio App.3d 10, 490 N.E.2d 926, syllabus. Ultimately, however, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin,20 Ohio App.3d at 175.
 {¶ 8} In the case sub judice, the trial court convicted appellant of domestic violence under R.C. 2919.25(A), which provides in pertinent part:
(A) No person shall knowingly cause or attempt to causephysical harm to a family or household member.
. . .
(F) As used in this section and sections 2919.251 and 2919.26of the Revised Code:
 (1) "Family or household member" means any of the following:
 (a) Any of the following who is residing or has resided withthe offender:
 (i) A spouse, a person living as a spouse, or a former spouseof the offender;
. . .
(2) "Person living as a spouse" means a person who is livingor has lived with the offender in a common law maritalrelationship, who otherwise is cohabiting with the offender, orwho otherwise has cohabited with the offender within five yearsprior to the date of the alleged commission of the act inquestion.
The burden is on the prosecution to establish beyond a reasonable doubt both elements of the offense: that appellant caused or attempted to cause physical harm to the victim, and that the victim was a family or household member.
 Physical Harm {¶ 9} The first essential element of domestic violence under R.C. 2919.25(A) is that the offender knowingly caused or attempted to cause physical harm to the victim. R.C.2901.01(A)(3) defines "physical harm to persons" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."
 {¶ 10} The State presented the testimony of the victim, Julia Barth, who was appellant's girlfriend when the incident occurred. Julia testified to the following events. On August 18, 2003, Julia and appellant got into an argument over whether or not she should visit an ex-boyfriend. After Julia agreed not to go see the ex-boyfriend, the two got into an argument about the nature of her relationship with another of Julia's male friends, Jacob Burks. Appellant believed that Julia had cheated on him with Jacob, and refused to believe her repeated denials of this accusation.
 {¶ 11} During the course of this argument appellant got very angry, began yelling and accused her of lying and infidelity. Julia testified that appellant spit on her, and grabbed her arms and threw her on the couch when she attempted to leave. This caused her arms to bruise. She testified that she was afraid to get up from the couch after that, out of fear that appellant would hit her or further hurt her. She further testified that she slept in the spare bedroom that evening, because appellant told her "if he woke up out of his sleep and he was having a bad dream or something he could go over and strangle me and not even realize it."
 {¶ 12} The following day, appellant called her cell phone several times while she was at work and left threatening messages. When she got home from work appellant closed and locked all the doors and windows so she could not leave. Julia testified that appellant then chased her up the stairs, and at the top of the stairs he shoved her into a dresser. She then began screaming and told him to stop it, to leave her alone. Julia testified that he repeatedly told her that she was not going anywhere and that she could not to leave. Appellant then grabbed her and threw her into a bedpost. He then pushed her onto the bed, got on top of her, and pressed his knee against her ear, pushing her head into the mattress.
 {¶ 13} Thereafter, appellant told Julia that she was going to stay with him and that they were going to "work it out." However, he also ordered her to seek counseling, to take a polygraph test, and to stay away from her friends and family. He told her that she would go to work and then come straight home, and that she could not go anywhere else unless she talked to him first. He then threatened to "break her knees" and that he would beat her if she did not obey him.
 {¶ 14} The next day, August 19, 2003, Julia called the police from work. She relayed the events of the previous two nights, and then asked that they escort her home because she wanted to ask appellant to get his things and move out, but was afraid to do so alone.
 {¶ 15} The State also presented the testimony of Lieutenant Nicholas Hile and Chief Robert Hollis of the Upper Sandusky Police Department. They questioned Julia about the events of the preceding two days. They examined and photographed her injuries, and then escorted Julia home in order to speak with the appellant. When they got to the apartment, the appellant fled out the backdoor, but was later apprehended by Chief Hollis in a nearby alleyway. Thereafter, Julia filed a domestic violence charge with the police, and signed a statement.
 {¶ 16} Lieutenant Hile testified that he questioned the appellant about the events that transpired the previous two nights. Lt. Hile stated that the appellant denied having assaulted Julia, but admitted that "if she had bruises he probably would have put them there."
 {¶ 17} The bruises caused when appellant grabbed the victim and threw her on the couch, the bruises on her ear from when he forced her head into the mattress, as well as the injuries sustained when appellant pushed her into the dresser and the bedpost, were sufficient to constitute "physical harm" as that term is defined in R.C. 2901.01. After viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could reasonably conclude that the prosecution had proven this essential element beyond a reasonable doubt. Therefore, we cannot conclude that the conviction was based on insufficient evidence pertaining to the physical harm.
 {¶ 18} Moreover, we cannot conclude that the trial court clearly lost its way or created such a manifest miscarriage of justice that the appellant's conviction must be reversed. Here, the trial court, as finder of fact, was best able to view the witnesses and judge their credibility. Although the appellant maintained in his police interrogation that he did not assault appellant, there was no other evidence in the record to contradict the testimony and physical evidence presented by the state. Therefore, the conclusion that appellant caused physical harm to Julia Barth was not against the manifest weight of the evidence.
 Cohabitation {¶ 19} Appellant next contends that the testimony at trial failed to demonstrate that he and the victim were "co-habitants" within the meaning of R.C. 2919.25. The resolution of this case therefore depends on whether the trial court could rationally conclude that the State had proven the essential element beyond a reasonable doubt, and whether the trial court "clearly lost its way" in determining that Ederly and Barth were "cohabitants" at the time of the offense.
 {¶ 20} There is no contention that appellant was or has ever been married to the alleged victim, or that they have lived together in a common-law marriage. Therefore, in order to convict appellant under R.C. 2919.25(A) the prosecution must prove that appellant is a "person living as a spouse" of his victim. This requires showing (1) that appellant was residing or had resided with the victim and (2) that the victim "otherwise is cohabitating with the offender" or "otherwise has cohabited with the offender" within the preceding five years. State v.Williams (1997), 79 Ohio St.3d 459, 461, 683 N.E.2d 1126.
 {¶ 21} In Williams, the Supreme Court defined "cohabitation" to include two essential elements: (1) the sharing of familial or financial responsibilities and (2) consortium.Williams, 79 Ohio St.3d at 465. The Court listed several factors that would tend to establish shared familial or financial responsibilities: "provisions for shelter, food, clothing, utilities, and/or commingled assets." Id. Additionally, the Court listed several factors that might establish consortium: "mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations." Id. The Court noted, however, that this was a case by case determination, and that the offense of domestic violence arises out of the nature of the relationship between the parties, and not the "exact living circumstances." Id. at 464.
 {¶ 22} At trial, Julia testified to the following facts. Julia and appellant had been dating for some time prior to August 2003. Appellant had moved out of his house and the couple moved into a two-bedroom apartment sometime during the summer of 2003. No other persons lived in the apartment with them. The second bedroom was reserved as a spare bedroom, as the couple normally shared the same bedroom. Additionally, Julia testified that appellant told her that if she was going to leave she must continue to pay three months rent and utilities. She also testified that both she and appellant worked.
 {¶ 23} Based on the preceding testimony, a rational conclusion could be made that Julia and appellant's living situation met the requirements of "cohabitation" as outlined by the Supreme Court in Williams. A reasonable inference could be drawn from the testimony the couple shared living expenses, including rent and utilities, which would demonstrate shared financial responsibilities. Further, the testimony to their personal relationship was sufficient to demonstrate consortium; they were living as boyfriend and girlfriend, they sought each other's comfort, fidelity, and friendship, and they were sharing the same bed.
 {¶ 24} Given this testimony, which was not impeached through cross examination nor challenged by conflicting evidence, we conclude that the evidence presented was sufficient to convince a rational trier of fact that the essential element that the victim be a "family or household member" was proven beyond a reasonable doubt. Therefore, the evidence was sufficient to establish both essential elements of the crime.
 {¶ 25} Moreover, given the evidence presented, reasonable minds could have concluded that the appellant and his victim were "cohabitants" as that term has been interpreted by the Ohio Supreme Court. Therefore, the verdict was not against the manifest weight of the evidence. Based on the foregoing, the assignment of error is overruled and the judgment and sentence of the trial court is affirmed.
Judgment Affirmed.
 Cupp and Rogers, JJ., concur.