[Cite as *State v. Hawkins*, 2012-Ohio-4622.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   24976 |
| v. | : | T.C. NO.   11CR2829 |
| BRIAN C. HAWKINS | : | (Criminal appeal from Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

## **O P I N I O N**

Rendered on the _____5th_____ day of _____October_____, 2012.

. . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

THOMAS M. KOLLIN, Atty. Reg. No. 0066964, 2661 Commons Blvd., Suite 214, Beavercreek, Ohio 45431
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}        This matter is before the Court on the Notice of Appeal of Brian

Hawkins, filed December 30, 2011.  Hawkins was convicted following a jury trial on one

count of domestic violence, in violation of R.C. 2919.25(A), a misdemeanor of the first degree, and he was found not guilty of one count of abduction. The trial court sentenced Hawkins to 180 days in jail.

{¶ 2}   At trial, Sally Jones, the victim herein, testified that she met Hawkins in February, 2011, at a bus stop in downtown Dayton, when she was on her way to work as a nursing aid. Jones stated that Hawkins gave her his phone number, and that she called him at 7:00 a.m. the next morning, when she ended her shift at work, and then she took the bus to his apartment on Riverside Drive. Jones stated that she was homeless at the time, and that Hawkins offered her some food and "let me lay down." She stated that she told Hawkins that she had nowhere to go, and that her things were stored at the home of a friend. Jones stated, after "a month of coming there every day, still going to work, but coming back every day and eating, me and his relationship did start to grow a little bit." During that time, Jones stated that she began to consider Hawkins her boyfriend, and she stated that he referred to her as his girlfriend. She stated that they became intimate, and that they "spent time together everyday."

{¶ 3}   Jones stated that Hawkins' mother and step-father also lived in the apartment. She stated that after a month, the four of them moved into another two-bedroom apartment across the street, and she stayed in one of the bedrooms with Hawkins. Jones testified that she stayed there from March until August. Jones stated that she "was drinking alcohol really heavy" and smoking marijuana when she met Hawkins, and that he introduced her to crack cocaine, which they often used together. According to Jones, "he was sort of what I would like to call an enabler because I didn't know where to go get these drugs. Only

he did.   So he leave and then come back.   So I always felt like I was waiting for him and I felt like he wanted me to be in that room waiting for him."   Jones stated that Hawkins was not employed.   She testified that Hawkins was away from the apartment at one point for 24 days, during which time she "didn't have him trying to be possessive and tell me where I could and couldn't go or to wait for him. So for those 24 days I was able to go visit friends * * * . But I was still welcomed back to the house.   Me and his mother had established a relationship also."   Jones stated that Hawkins' mother gave her a key to the apartment.

{¶ 4}     According to Jones, she left the apartment when Hawkins returned after his 24 day absence because she "didn't know if he was going to be angry with me."   After talking to Hawkins on the phone, Jones stated that she returned to the apartment on August 10, 2011, and that she and Hawkins resumed their drug usage "for a couple of days."   On the third day, Jones stated that she stopped using drugs because she had to go to work, but that Hawkins' drug use continued.   Jones stated that Hawkins sold his car "for $200 and some drugs," and he took his mother's cell phone.   Jones stated that Hawkins' mother "had gotten flustered" and instructed her and Hawkins' step-father not to let Hawkins back into the apartment.   Jones stated that all of her things were stored in boxes and baskets in the living room of the apartment.

{¶ 5}     Jones indicated that she took a shower at the apartment and as she prepared to leave she heard Hawkins knocking on the door and the window, and yelling at her to let him inside.   Hawkins' step-father was present, and he phoned the sheriff's department. When the deputies responded, Hawkins was gone, and the officers left the scene. According to Jones, Hawkins then returned to the apartment and tried to pry open the

window. Jones stated that she told Hawkins' step-father to call the police, and that thereafter, Hawkins kicked in the front door of the apartment. Jones stated that as she backed up into the bathroom to get away from Hawkins, he shoved her and she fell into the bathtub.

{¶ 6} While Hawkins and his step-father argued, Jones testified that she got out of the bathtub and "scooted past" Hawkins, out the door of the apartment. She stated that Hawkins followed her out the door, and that she asked him to leave her alone and told him that she was leaving. Jones stated that she walked around a nearby car, and she stated that Hawkins began to chase her around the car. Jones stated that she ran away from the car, and that Hawkins chased her until she stumbled and fell. According to Jones, Hawkins then got "on top of me and he just starts hitting me in the head" with a closed fist. Jones stated that Hawkins told her to give him her key to the apartment, and that after she did so, "that's when he proceeded to choke me." Jones stated that she "started to see the light fade from my eyes" as though she were fainting. According to Jones, Hawkins also bit her fingers to retrieve her cell phone from her hand.

{¶ 7} Jones stated that after she released her cell phone, Hawkins told her to get up so that they could go to a friend's apartment and "'watch some cable.'" Jones stated that she did not want to accompany Hawkins, but he lead her away by her wrist or her arm. Jones stated that Hawkins then grabbed her "scrub top" to pull her along, and she testified that she fell down. Jones stated that Hawkins dragged her until she told him that she would comply and walk with him. She stated that while he was dragging her, he ripped her scrub top "all the way down the middle," and that he said, "'I should just kick your head off like a

football.'" Jones stated that Hawkins also told her, "'You burned me,'" and that he was using a lot of profanity.

{¶ 8} Jones stated that she tried to "veer off" toward the nearby bus stop, and that Hawkins said, "'No. Like I said, you're coming with me.'" Jones stated that she was crying as they approached the apartment of Hawkins' friend, and that she refused to go inside, stating, "I'm not going in there with you because I don't know what's going to happen when I go into this apartment." Jones stated that Hawkins then slapped her in the eye with an open hand. Jones then noticed that security personnel for the apartment complex had arrived, and she ran to a security guard. According to Jones, two or three police cruisers also responded, and some officers stayed with her while others searched for Hawkins. Jones stated that she provided oral and written statements to the officers, and that they photographed her. Jones stated that she experienced soreness and a headache, she had a cut under her right eye, and her fingers were bleeding. She also stated her legs were sore from Hawkins sitting on her.

{¶ 9} On cross-examination, Jones stated that she was initially under the impression that the first apartment belonged to Hawkins and that his mother and step-father lived there with him, but she later learned that it was his mother's apartment. She stated that she lived in both apartments for about six months, but that she did not sign a lease or pay rent. Jones stated that she bought cleaning supplies and she "didn't really have to buy food, but if it was necessary I had bought food at one point for the house." She stated, if Hawkins' mother "needed some money and she asked me, I'd give her some money." Jones stated that her friend who initially allowed her to keep her things at her home was "kind of getting fed up with my things being in her home," and that Hawkins "was really pushing the

idea for me to bring all my things and stay with him." Jones described her relationship with Hawkins' step-father as "a grandfather type relationship."

{¶ 10} Jones stated that she told Hawkins she was leaving between August 10, 2011 and August 16, 2011, but that she had not "attained any type of stability" due to drug use, and she had not saved any money. She stated that Hawkins brought many women home during the period of drug usage, and that he engaged in sexual activities with them. When asked where Hawkins was between June and August, Jones replied, "he got locked up in jail." When Hawkins came home in August, Jones testified, "I was trying to prepare my mind to go ahead and transition to the shelter. And in the process, I didn't know what to do with my things." Jones stated that Hawkins allowed her to use his car to run errands. She stated that Hawkins' mother was angry that he took her cell phone. According to Jones, she planned to take the bus to the home of a friend the night of the incident, and for the last three days she had been "coming back and forth, * * * to change my clothes, maybe eat something, but then I made sure I stayed away."

{¶ 11} At the close of the State's evidence, counsel for Hawkins moved for an acquittal, pursuant to Crim.R. 29, and his motion was specifically addressed to the abduction charge. The court overruled the motion.

{¶ 12} Hawkins testified that he and Jones had an intimate relationship. He stated that Jones told him she "was battling drugs" and suffered from mental illness, and that her "family didn't want her around." Hawkins stated that Jones used crack cocaine before she met him. Hawkins stated that he was a student at Sinclair, studying heating and air conditioning, but that he planned to change his major due to "nervous damage" in his leg

that occurred when he was shot in a bar fight. As a result of that injury, Hawkins testified that he is unable to run, but that he can "move fast, but not fast enough to catch nobody or get away from nobody."

{¶ 13} Hawkins stated that, while the apartment was his mother's, "most of the stuff in the apartment I paid for. I had my keys, Sally never had the key." He testified that he took his mother's cell phone because his phone was "stuck on speaker phone." According to Hawkins, he left the phone at a restaurant, returned home and told his mother that he "was going to get the phone." He stated that his mother was upset but "knew I was going to get her phone." Hawkins described Jones as a "wild young woman," and he testified that she was aware that he dated other women in the course of their relationship, and that she "would call women over to be with me and her."

{¶ 14} Regarding the date of the incident, Hawkins stated that he had been to the funeral of a friend and spent the previous night with the family of the deceased, indulging in alcohol. When he returned to the apartment, no one was home and the door was locked, and he testified that he "laid down in front of the door" to wait for someone to come home. When no one appeared, Hawkins stated that he went to another apartment of a friend in the complex to wait, returning to his mother's apartment around 11:00 p.m. He stated that he observed Jones in their bedroom, and that he knocked on the window and told her to let him in. Hawkins stated that Jones turned out the light, and that he then yelled at her two or three times through the mail slot to open the door. Hawkins stated that his step-father told him to get away from the door and also said, "'You done took my baby's cell phone.'"

{¶ 15} Hawkins stated that when Jones left the apartment, she had his key, and he

followed her to retrieve it from her. According to Hawkins, Jones ran beside a parked car, and she snagged her shirt on the car and "the shirt just ripped." Hawkins stated that Jones "just collapsed." Hawkins stated that he stood over her and asked for his key. After she gave it to him, Hawkins stated that he told her, "Sally, it's over with." Hawkins stated that Jones followed him, and that he told her she could continue to store her things in the apartment until she found another place to stay. He stated that he told her, as they walked past his friend's apartment, "We can go in here, you can start making some preparation so you could get away from over here with me and my family." He denied attempting to force Jones into the apartment. Hawkins denied ever striking Jones. Hawkins stated that when he returned to the apartment after his 24 day absence "from the first fake domestic violence case," that he packed Jones' clothing in boxes and baskets, and that he left her a message to come and retrieve her things and return his car. He stated that Jones never paid rent and/or bought food.

{¶ 16} On cross-examination, Hawkins confirmed that he and Jones shared a bedroom together, were involved in a sexual relationship, and used drugs together. Hawkins stated that he intended on the date of the incident to kick the door "just to make a sound and walk away," and that he was surprised when it opened.

{¶ 17} At the close of the evidence, counsel for Hawkins renewed his motion for acquittal on the "[s]ame basis as previously stated," and the court overruled the motion "upon the same basis." On December 19, 2011, Hawkins filed a Motion for Acquittal, in which he argued that his domestic violence conviction is against the manifest weight of the evidence. The court overruled the motion on December 22, 2011, and its Decision and

Entry provides that it proceeded to sentence Hawkins on December 21, 2011, "without knowledge of the Motion for Acquittal filed by Mr. Hawkins, through his attorney, on December 19, 2011."

{¶ 18}   Hawkins' first assigned error is as follows:

"THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR ACQUITTAL AS TO THE CHARGE WHEN THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION."

{¶ 19}   Hawkins asserts that the State did not present sufficient evidence to establish that Jones was a "household member" within the meaning of the domestic violence statute, R.C. 2919.25, because her relationship with Hawkins did not "rise to the level of cohabitation."  The State responds that it "proved the consortium requirement of cohabitation."

{¶ 20}   As this Court has previously noted:

When considering a Crim.R. 29 motion for acquittal, the trial court must construe the evidence in a light most favorable to the State and determine whether reasonable minds could reach different conclusions on whether the evidence proves each element of the offense charged beyond a reasonable doubt. * * * The motion will be granted only when reasonable minds could only conclude that the evidence fails to prove all of the elements of the offense. * * *

A Crim.R. 29 motion challenges the legal sufficiency of the evidence. A sufficiency of the evidence argument challenges whether the State has

presented adequate evidence on each element of the offense to allow the case to go to jury or sustain the verdict as a matter of law. * * * The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492:

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Cranford*, 2d Dist. Montgomery No. 23055, 2011-Ohio-384, ¶ 30-32.

{¶ 21} "[T]he offense of domestic violence * * * arises out of the relationship of the parties rather than their exact living situation." *State v. Williams*, 79 Ohio St.3d 459, 464, 683 N.E.2d 1126 (1997). R.C. 2919.25(A) provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(F)(1) defines family or household member in relevant part as : "(a) Any of the following who is residing or has resided with the offender: (i) A spouse, a person living as a spouse, or a former spouse of the offender." R.C. 2919.25(F)(2) provides: "'Person living as a spouse' means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who has otherwise cohabited with the offender within five years prior to the date of the alleged

commission of the act in question."

{¶ 22}   As the Supreme Court of Ohio determined:

> [T]he essential elements of "cohabitation," are (1) sharing of familial or financial responsibilities and (2) consortium. * * * Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations.   These factors are unique to each case and how much weight, it any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact.   *Williams*, at 465.

"The burden of establishing cohabitation is not substantial."   *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2d Dist. 2004), ¶ 73.

{¶ 23}   Jones testified that Hawkins gave her food, and that she shared a bedroom with him at his apartment for several months.   She stated that she considered him to be her boyfriend, and that he referred to her as his girlfriend.   She stated that they spent time together every day and were sexually intimate.    Jones moved her things into the apartment from the home of her friend at Hawkins' insistence, and she had a key to the apartment. Jones stated that she developed relationships with Hawkins' mother and step-father.   She stated that Hawkins was possessive of her, and that she felt that she had to wait for him to return to the apartment.   She testified that they used drugs, that he provided, together in the home.   Jones bought cleaning supplies for the apartment, once bought food and gave

Hawkins' mother money if she asked for it. Hawkins allowed her to use his car for errands. Having viewed the evidence in a light most favorable to the State, we conclude that sufficient evidence exists for a rational trier of fact to conclude that Jones' and Hawkins' relationship rose to the level of cohabitation, and that Jones and Hawkins were household members. There being no merit to Hawkins' first assigned error, it is overruled.

{¶ 24}    Hawkins' second assigned error is as follows:

"APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 25}    Hawkins again asserts that he and Jones were not household members.

{¶ 26}    As this Court has previously noted, in a weight of the evidence challenge, an appellate court:

> [R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. While *Thompkins* explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the

limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges as follows:

> Because the factfinder, be it the jury or * * * trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in *Thompkins*, *supra*, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence - in short, how persuasive it is. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, unreported.

*State v. Pierre,* 2d Dist. Montgomery No. 18443, 2001 WL 220239 (March 2, 2001).

{¶ 27} Having considered the entire record and weighed the evidence and all reasonable inferences, for the reasons set forth above, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice such that Hawkins is entitled to a new

trial. The jury clearly credited Jones' testimony regarding the nature of her relationship with Hawkins and concluded that they were household members, and we defer to their assessment of credibility. Accordingly, Hawkins' second assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

GRADY, P.J. and FAIN, J., concur.

Copies mailed to:

Michele D. Phipps
Thomas M. Kollin
Hon. Michael L. Tucker