[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 459.]

THE STATE OF OHIO, APPELLANT, *v*. WILLIAMS, APPELLEE.

[Cite as *State v. Williams*, 1997-Ohio-79.]

*Criminal law—Offenses against the family—Offense of domestic violence arises out of the relationship of the parties rather than their exact living circumstances—Essential elements of "cohabitation."*

1. The offense of domestic violence, as expressed in R.C. 2919.25(E)(1)(a) and related statutes, arises out of the relationship of the parties rather than their exact living circumstances.

2. The essential elements of "cohabitation" are (1) sharing of familial or financial responsibilities and (2) consortium. (R.C. 2919.25[E][2] and related statutes, construed.)

(No. 96-930—Submitted May 6, 1997—Decided September 24, 1997.)

APPEAL from the Court of Appeals for Hamilton County, No. C-950530.

————————————

{¶ 1} On April 12, 1995, Donesia R. Liggins reported to the police that defendant-appellee, Kevin Williams, pushed her onto the bed, tried to smother her, and twisted her arm. The police filed in Hamilton County Municipal Court a complaint charging Williams with domestic violence, a violation of R.C. 2919.25, and a motion for a temporary protection order. That same day, the court arraigned Williams and granted the motion for a temporary protection order.

{¶ 2} On June 20, 1995, the court tried Williams on the charge of domestic violence. At the trial, Liggins testified that she did not live with Williams, but that they "were going together." She stated that for a few months she was staying more nights at his place than at hers. She and Williams both testified that on April 12, 1995, they were fighting over money problems, and Liggins stated that she wanted to get away from him. Liggins further stated that the fight became physical and

that Williams pointed a gun at her. Cincinnati Police Officer William Nastold testified that when he arrived at the scene, Liggins and Williams were arguing and pushing each other in front of the house. Nastold stated that upon his arrival, Liggins told him that during the argument over money, Williams pushed her on the bed and attempted to smother her, twisted her arm behind her back, and pointed a shotgun at her, threatening to kill her. Liggins also testified that she did not want to prosecute the charge against Williams because she thought she was pregnant with his child.

{¶ 3} The court found Williams guilty of the charge of domestic violence. Upon appeal, Williams asserted that the trial court had erred by (1) trying him without the assistance of defense counsel and (2) convicting him of a violation of domestic violence without evidence of cohabitation between Williams and Liggins. The court of appeals reversed and discharged appellant, holding that (1) the trial court violated Williams's constitutional criminal rights to counsel and (2) the evidence was insufficient as a matter of law to show that Williams and Liggins were cohabiting.

{¶ 4} The cause is now before this court pursuant to the allowance of a discretionary appeal.

———————————————

*Fay D. Dupuis*, City Solicitor*, Terrence R. Cosgrove*, City Prosecutor, and *Charles F. Dorfman*, Senior Assistant City Prosecutor, for appellant.

*H. Fred Hoefle*, for appellee.

———————————————

**ALICE ROBIE RESNICK, J.**

{¶ 5} Initially, we note that appellant, the state of Ohio, did not appeal the issue of appellee's right to counsel at trial. Thus, the sole issue before this court is whether there is sufficient evidence to prove that Liggins and Williams were

"family or household members," as is required in order to convict appellee of a violation of R.C. 2919.25.

{¶ **6**} R.C. 2919.25 states:

"(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.

"(B) No person shall recklessly cause serious physical harm to a family or household member.

"(C) No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member.

"* * *

"(E) As used in this section * * * of the Revised Code:

"(1) 'Family or household member' means any of the following:

"(a) Any of the following who is residing or has resided with the offender:

"(i) A spouse, a person living as a spouse, or a former spouse of the offender;

"(ii) A parent or a child of the offender, or another person related by consanguinity or affinity to the offender;

"(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender.

"(b) The natural parent of any child of whom the offender is the other natural parent.

"(2) 'Person living as a spouse' means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is

cohabiting with the offender, or who otherwise has cohabited with the offender within one year prior to the date of the alleged commission of the act in question."[1]

{¶ 7} Liggins and Williams do not contend that they are married, have ever been married, or have lived together in a common-law marriage. Thus, to convict Williams for domestic violence under R.C. 2919.25, the prosecution must prove that Liggins is a "person living as a spouse" of Williams by showing that she (1) resides or has resided with Williams (R.C. 2919.25[E][1][a]), and (2) "otherwise is cohabiting with [Williams], or * * * otherwise has cohabited with [Williams]." R.C. 2919.25(E)(1)(a)(iii) and 2919.25(E)(2).

{¶ 8} This court has never defined "cohabitation," and the courts of appeals throughout Ohio have adopted various definitions. Williams notes that regardless of the definition of "cohabitation," the definition of "family or household member" necessarily includes a person "who is residing or has resided with the offender," R.C. 2919.25(E)(1)(a), and urges this court to adopt a narrow definition of "reside" which would limit "family or household members" to those who actually share one residential address. This we decline to do.

{¶ 9} Words and phrases in a statute must be read in context of the whole statute. *Commerce & Industry Ins. Co. v. Toledo* (1989), 45 Ohio St.3d 96, 102, 543 N.E.2d 1188, 1196. As we stated in *Felton v. Felton* (1997), 79 Ohio St.3d 34, 679 N.E.2d 672, "The General Assembly enacted the domestic violence statutes specifically to criminalize those activities commonly known as domestic violence and to authorize a court to issue protection orders designed to ensure the safety and protection of a complainant in a domestic violence case." *Id.* at 37, 679 N.E.2d at 674, citing Ohio Legislative Service Commission, Summary of 1978 Enactments, June-December (1979), at 9-14; Legislative Service Commission Analysis of

---

1. The General Assembly has amended R.C. 2919.25 since the commission of the subject offense; however, the changes do not affect this decision or opinion.

Sub.H.B. No. 835 as reported by Senate Judiciary Committee (1978), at 2 and 7 (Comment A); Legislative Service Commission Analysis of Am.Sub.H.B. No. 835 as enacted (1978), at 1 and 2.

{¶ 10} In contrast to "stranger" violence, domestic violence arises out of the *relationship* between the perpetrator and the victim. Social science studies show that the rate of violence in dating relationships is at least the same as, if not greater than, that of couples who maintain one address. Klein & Orloff, Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law (1993), 21 Hofstra L.Rev. 801, 836-837. The article summarizes those studies:

"Social science research that documents violence in dating relationships supports offering broader civil protection order coverage to dating partners and adolescents.[2] A study of teen dating violence found that roughly one in four

---

2. "In some domestic violence cases the perpetrator and/or the victim may be adolescents who are engaging in the same pattern of abusive behavior as occur in adult relationships. *See* [Anne L.] Ganley, [*Domestic Violence: The What, Why and Who, as Relevant to Civil Court Cases*, *in* Domestic Violence in Civil Court Cases: A National Model for Judicial Education (Jacqueline A. Agtuca et al. eds.1992)], at 22.

"Estimates of the rates of physical violence in dating relationships range from 20% to 67%. *See*, *e.g.*, Angela Browne, When Battered Women Kill 42 (1987) (21%-30%); Richard Gelles & Claire Pedrick Cornell, Intimate Violence In Families 65 (1987) (10%-67%); National Clearinghouse for the Defense of Battered Women, Statistics Packet: 1992 Addendum Only 14 (1992) (stating that 'studies of high school and college students conducted during the 1980s have reported rates of dating violence ranging from 12% to 65%'); National Council of Juvenile and Family Court Judges, *Family Violence: The Facts*, 1 Juv. and Fam. Just. Today 21, 21 (1993); Lisa Morrell, *Violence in Premarital Relationships*, 7 Response 17 (1984) (21.2%); Nona K. O'Keefe et al., *Teen Dating Violence*, Social Work, Nov./Dec. 1986, at 465, 465-66 (12%-26.9%); Linda P. Rouse et al., *Abuse in Intimate Relationships: A Comparison of Married and Dating College Students*, 3 J. Interpersonal Violence 414, 422-23 (1988) (reporting that 28.2% of heterosexual dating students had been pushed, shoved, or grabbed by a dating partner, and that 30% of battered women eventually marry someone who had abused them during courtship); Stark & Flitcraft, [*Violence Among Intimates: An Epidemiological View*, Handbook of Family Violence (Van Hasseth et al. eds. 1987)], at 301 (discussing four studies of premarital or courtship violence on college campuses, with findings of physical aggression or threats in 13.5%, 19%, 31.5%, and 42% of the relationships, respectively); [Judge Richard L.] Price, [*Love and Violence: Victims and Perpetrators*, Remarks at the New York City Coalition for Women's Mental Health (Jan.1991)] (33%)."

students experienced actual violence, either as victims or as perpetrators.[3] A 1985 survey at a midwestern university found higher rates of violence in dating relationships than between married couples.[4] Another study reported that 32% of domestic violence offenders are boyfriends or ex-boyfriends.[5]" (Footnotes renumbered.) *Id.*

{¶ 11} As these studies show, the offense of domestic violence arises out of the relationship itself, not the fact that the parties happen to share one address. As the court in *Holmes v. Wilson* (Nov. 9, 1994), Del.Fam.Ct., New Castle Cty. No. CN94-08637, 1994 WL 872663, unreported, at 1, stated, "Domestic violence is an unusual outgrowth of an intimate relationship between a man and a woman. It has certain inherent characteristics which place the victim in a position of being extremely susceptible to violence at any given time and/or place."

{¶ 12} The General Assembly recognized the special nature of domestic violence when it drafted the domestic violence statutes. The provision allowing for the filing of a motion for a temporary protection order, R.C. 2919.26, provides that such a motion may be filed upon the filing of a complaint alleging a violation of R.C. 2919.25 (domestic violence) or any of the assault offenses if that assault involved a "family or household member." R.C. 2919.26(A)(1). Clearly, the General Assembly believed that an assault involving a family or household member

---

3. "O'Keefe [*supra*], at 467 (12%-26.9%) (noting that high school students who reported spousal violence between their parents had a statistically greater rate of violence in their dating relationships. More than 51% of students who witnessed their parents being abusive to each other had been involved in an abusive relationship. Furthermore, 47% of the students who were abused as children had been in a dating relationship in which violence occurred.)"

4. "Jan. E Stets & Murray A. Strauss, *The Marriage License as a Hitting License: A Comparison of Assaults in Dating, Cohabiting, and Married Couples*, *in* Physical Violence in American Families: Risk Factors and Adaption to Violence in 8,145 Families 227, 227-44 (Murray A. Straus & Richard J. Gelles eds., 1990)."

5. "[Caroline W.] Harlow, [U.S. Dep't. of Justice, Female Victims of Violent Crime (1991)], at 2."

deserves further protection than an assault on a stranger. Therefore, we hold that the offense of domestic violence, as expressed in R.C. 2919.25(E)(1)(a) and related statutes, arises out of the relationship of the parties rather than their exact living circumstances.

{¶ 13} Additionally, the wide-ranging definitions of "cohabitant" and "family or household member" in the context of domestic violence developed by various courts of appeals and trial courts in Ohio, as well as courts in other states, reflect this view that domestic violence arises out of the nature of the relationship itself, rather than the exact living circumstances of the victim and perpetrator. See, *e.g.*, *State v. Miller* (1995), 105 Ohio App.3d 679, 664 N.E.2d 1309 (Sexual relations are not necessarily a requirement for cohabitation — living together with some regularity of functioning as husband and wife is sufficient.); *State v. Yaden* (Mar. 5, 1997), Hamilton App. No. C-960483, unreported, 1997 WL 106343 (Cohabitation requires two elements: [1] financial support and [2] consortium.); *State v. Hammond* (Dec. 20, 1996), Montgomery App. No. 15923, unreported, 1996 WL 748272 (Common-law marriage is not an essential element of cohabitation.); *State v. Shipman* (Feb. 14, 1994), Stark App. No. CA-9454, unreported, 1994 WL 45885 (Evidence that parties had shared apartment during the past year is sufficient to show cohabitation.); *State v. Van Hoose* (Sept. 27, 1993), Clark App. No. 3031, unreported, 1993 WL 386314 (Living together without sexual relations constitutes cohabitation.); *State v. Wagner* (Aug. 11, 1993), Medina App. No. 2205, unreported, 1993 WL 303255 (Living together for two weeks with the intention of permanency and with sexual relations constitutes cohabitation.); *Cleveland v. Crawford* (Sept. 28, 1989), Cuyahoga App. Nos. 55899 and 55900, unreported, 1989 WL 113070 (Living together for one month, being "intimate" on more than one occasion, sharing closet space, and the woman cooking and doing laundry for the man are enough to establish cohabitation.); *O'Kane v. Irvine* (1996), 47 Cal.App.4th 207, 54 Cal.Rptr.2d 549 (Domestic relationship [subletting from same

person, sharing common areas] caused solely by happenstance is not cohabitation.); *People v. Siravo* (1993), 17 Cal.App.4th 555, 21 Cal.Rptr.2d 350 ("Cohabitants" is defined as two people who live or dwell together in the same household, as cotenants.); *Caldwell v. Coppola* (1990), 219 Cal.App.3d 859, 268 Cal.Rptr. 453 (Sister of victim named as a family and household member is also protected from defendant by the temporary restraining order protecting victim.); *People v. Holifield* (1988), 205 Cal.App.3d 993, 252 Cal.Rptr. 729 ("Cohabitant" means "significant relationship" while living together, even off and on. "Cohabitant" is not limited to a "full quasi-marital" relationship.); *People v. Ballard* (1988), 203 Cal.App.3d 311, 249 Cal.Rptr. 806 (Cohabiting partners with separate residences who were "together a lot" over a period of two years had a "significant relationship" and thus were covered by statute.); *Bryant v. Burnett* (1993), 264 N.J.Super. 222, 624 A.2d 584 (Members of a household at the time, regardless of the intent as to permanency of arrangement or relationship are cohabitants.); *Croswell v. Shenouda* (1994), 275 N.J.Super. 614, 646 A.2d 1140 (Without any indicia of "sharing of a household," [spending nights together, etc.], there is no cohabitation.); *Desiato v. Abbott* (1992), 261 N.J.Super. 30, 617 A.2d 678 (When parties are constant companions, stay overnight on occasion, keep personal property at each others' places, and dine socially with parents, they are household members.). See, also, Comment, Criminal Protection Orders in Domestic Violence Cases: Getting Rid of Rats With Snakes (1996), 50 U. Miami L.Rev. 919, 926-927; Note, Michigan's Domestic Violence Laws: A Critique and Proposals for Reform (1995), 42 Wayne L.Rev. 227, 244; Suarez, Teenage Dating Violence: The Need for Expanded Awareness and Legislation (1994), 82 Cal.L.Rev. 423, 435; Klein & Orloff, at 836-837. But, see, *State v. Hadinger* (1991), 61 Ohio App.3d 820, 573 N.E.2d 1191 (Cohabitation requires "living together," regardless of whether parties are of the opposite or the same gender.); *State v. Allen* (1988), 42 Ohio App.3d 116, 536 N.E.2d 1195, motion to certify record overruled (1988), 38 Ohio St.3d 724, 533

N.E.2d 1063 (Common-law marriage-type of relationship is essential to a finding of cohabitation. Short period of living together without mutual support and without regarding the situation as a husband/wife situation is not cohabitation.); *State v. Linner* (M.C.1996), 77 Ohio Misc.2d 22, 665 N.E.2d 1180 ("Cohabiting" is generally defined as living together and functioning as a husband and a wife and includes homosexual couples.).

{¶ 14} Having considered the above definitions of "cohabitant" and "family or household member," we conclude that the essential elements of "cohabitation" are (1) sharing of familial or financial responsibilities and (2) consortium. R.C. 2919.25(E)(2) and related statutes. Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact.

{¶ 15} In the case *sub judice*, both Liggins and Williams testified that the inception of the violence was a fight over money problems. Based on this testimony, the court could have reasonably concluded that a relationship existed wherein the two commingled their assets, thus sharing certain familial or financial responsibilities. Liggins further testified that the two spent most of their nights together at Williams's residence, and that at one time she thought she might be pregnant with his child. Their relationship thus was based upon society and conjugal relations, and therefore included consortium. Accordingly, the trial court did not err in finding that Liggins and Williams were cohabitants.

{¶ 16} We reverse the court of appeals' judgment on the issue of whether there is sufficient evidence to prove that Liggins and Williams were "family or household members." Because we do not address the issue of Williams's right to

counsel, the cause is remanded to the trial court for a new trial consistent with this opinion.

*Judgment reversed*

*and cause remanded.*

DOUGLAS, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and PFEIFER, J., concur in judgment only.

————————————