OPINION
Clayton S. Williams was found guilty of domestic violence and abduction by a jury in the Clark County Court of Common Pleas. The trial court sentenced Williams to one year in prison for domestic violence and to four years in prison for abduction, to be served consecutively with his sentence for domestic violence. Williams appeals from these convictions.
The state's evidence was as follows. Williams presented a different version of events at trial, but he does not appear to contest the facts for purposes of this appeal.
Williams met Heather Shortridge in Columbus in mid-September 1998 through mutual friends. Williams and Shortridge began a sexual relationship and Williams asked Shortridge to move into his girlfriend's apartment with them that same day. Although Williams initially told his girlfriend, Mary, that Shortridge was his half-cousin, Mary apparently realized the nature of Williams' relationship with Shortridge and the living arrangements became tense. After about a month, Shortridge and Williams decided to move to Springfield to live with Williams' mother, brother, and uncle. Shortridge borrowed her great grandmother's car to facilitate the move.
The relationship could be fairly characterized as a continuous cycle of fighting and making up, and this pattern continued in Springfield. Shortridge was afraid to speak with the other men in the house because Williams would accuse her of having slept with them. Shortridge tried to leave Williams at one point, but he convinced her to come back. Neither party had a job during this period.
On October 24, 1998, Williams accused Shortridge of sleeping with another man in Columbus earlier that month. He shoved her into a bannister, held her against a wall by her neck as he yelled at her, and ordered her to sit on the couch as they continued to argue. According to Shortridge, Williams' behavior scared her. On the couch, Williams threatened Shortridge with a pocketknife and told her to stop crying. Williams put the knife in Shortridge's hand and told her that she had five minutes to kill him or he was going to kill her. Williams eventually placed his hand on top of the hand in which Shortridge held the knife and made a cut on the top of his wrist, telling her that she "might as well have done it [i.e., killed him] `cause [she] cheated" on him. Shortridge later retrieved and hid this knife.
The next day, Williams and Shortridge went to Columbus and saw Shortridge's great grandmother, among others. While Williams was out of the room, Shortridge arranged a signal with her great grandmother because she was afraid of and knew that things were not going well with Williams: if Shortridge called the great grandmother on the phone and told her that she needed to see a dentist, the great grandmother was to come to Springfield to retrieve Shortridge as soon as possible. Shortridge returned to Springfield with Williams that night.
When they returned to Springfield, Williams and Shortridge went to his mother's bedroom and began to argue. Williams took a butterfly knife out of the mother's night stand and rubbed it all over Shortridge's body. At first, he did this atop her clothes, but then he told her to take off her clothes and rubbed the knife on her legs, stomach, chest, and neck. He also told Shortridge that he was "going to cut off [her] pussy lips and send them" to the man with whom he had been accusing her of cheating on him. Shortridge did not try to get away because she was afraid and because Williams had made her shut and lock the bedroom door. Williams held Shortridge so that she could not move and suggested that, if her face was "all fucked up maybe no one else would want [her]." He cut her on her throat, face and foot enough to draw blood. They "made up" afterward and had sexual intercourse, although Shortridge was still upset. They continued to argue over the next two days, but without serious incident.
On the morning of October 28, 1998, Williams and Shortridge had sexual intercourse, after which Williams told Shortridge that she made him sick, and he burned her on the forehead with a cigarette. Williams then went into the kitchen and vomited while Shortridge moved to the couch in the front room of the house. A short while later, Williams emerged from the kitchen with a butcher knife. Shortridge immediately ran from the house in a T-shirt and boxer shorts, although it was a cold, rainy day. She ran approximately two blocks, during which she yelled to a little boy to call the police. She tried to jump into the passenger side of a truck that was stopped at an intersection, but Williams caught up with her and pulled her from the truck. They sat on a nearby porch while Williams tried to convince Shortridge to come back to the house. When she refused, he dragged her back by her arm and hair. Later that day, Shortridge convinced Williams to take her to a pay phone so that she could call her great grandmother, and she gave the grandmother the signal that she "needed to go to the dentist." The grandmother picked Shortridge up later that day and took her to a police station to file a report.
On November 9, 1998, Williams was indicted on one count of domestic violence, with a specification that he had previously been convicted of domestic violence, one count of abduction, and one count of rape. The count of rape was later dismissed. Williams was tried on April 27 through 29, 1999, and was found guilty on the remaining counts. He was sentenced as described supra.
Williams raises three assignments of error on appeal.
 I. THE VERDICT OF GUILTY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Williams argues that his conviction of abduction was against the manifest weight of the evidence because there was extensive evidence that, while they were living together, Shortridge had had numerous opportunities to leave him if she had wanted to do so.
When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Thompkins (1997), 78 Ohio St.3d 380, 387, citing State v.Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, supra, at 175.
Williams was indicted for abduction in violation of R.C. 2905.02(A)(2), which provides that no person shall knowingly restrain the liberty of another person, by force or threat, under circumstances which create a risk of physical harm to the victim or place the other person in fear. Williams was not accused of restraining Shortridge's liberty throughout the course of their relationship, as his argument would seem to suggest. Rather, he was charged with restraining her liberty on October 28, 1998. On that date, according to Shortridge, Williams came toward her with a butcher knife, chased after her when she fled from the house, pulled her out of a truck that she had tried to enter in an effort to escape from him, and dragged her back to the house. Williams testified to a different version of events, but the credibility of the witnesses was for the jury, and it was free to believe Shortridge's version over Williams'. Shortridge's version supported Williams' conviction for her abduction on October 28, 1998, notwithstanding her ability to break off their relationship at any time, and thus his conviction was not against the manifest weight of the evidence.
The first assignment of error is overruled.
 II. THE STATE FAILED TO PROVE THE ESSENTIAL ELEMENTS OF THE CHARGE OF DOMESTIC VIOLENCE.
Williams claims that the state failed to prove that Shortridge was a person living as his spouse for purposes of a domestic violence conviction because it did not prove that he had been cohabiting with Shortridge. He claims that he and Shortridge "merely lived together and did not cohabitate within the meaning as defined by State law" because they did not financially support one another.
R.C.2919.25(A) provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." A "family or household member" is defined so as to include a spouse, a person living as a spouse, or a former spouse of the offender. R.C.2919.25(E)(1)(a)(i). A "person living as a spouse" is further defined as a person who is living with or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question. R.C.2919.25(E)(2).
For purposes of this appeal, Williams does not dispute that he knowingly caused physical harm to Shortridge. Rather, he contends only that Shortridge was not a member of his family or household. Specifically, he contends that the state presented insufficient evidence that Shortridge was a person living as his spouse. The parties were not and had never been married.
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
Because the General Assembly believed that an assault involving a family or household member deserved further protection than an assault on a stranger, "the offense of domestic violence, as expressed in R.C.2919.25(E)(1)(a) and related statutes, arises out of the relationship of the parties rather than their exact living circumstances." State v.Williams, 79 Ohio St.3d 459, 463-464. Cohabitation is the central element of the R.C. 2919.25(E)(2) definition of a person living as one's spouse. The supreme court has held that the essential elements of cohabitation are the sharing of familial or financial responsibilities and consortium.Id., paragraph two of the syllabus. Williams implicitly concedes that the "consortium" requirement was met, i.e., both parties admit that they spent almost all of their time together and engaged in conjugal relations. Williams maintains, however, that he and Shortridge did not share financial responsibilities as spouses would do.
Possible factors establishing shared familial or financial responsibilities include provisions for shelter, food, clothing, utilities, and commingled assets. Williams, 79 Ohio St.3d at 465. These factors are unique to each case, and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact. Id. The burden of establishing cohabitation is not substantial. State v. Young (Nov. 20, 1998), Montgomery App. No. 16985, unreported. In determining issues such as whether two persons had cohabited for purposes of R.C. 2919.25(E)(2), "courts should be guided by common sense and ordinary human experience." Id.
During the course of their six or seven week relationship, Williams and Shortridge did not maintain a "traditional" lifestyle, and thus there were few of the "traditional" indicia of married life or cohabitation. For example, neither Williams nor Shortridge was employed, had a house or apartment, or owned a car. They borrowed cars and moved from place to place according to their whims and which family member or friend would take them. Because they had no financial responsibilities, there was none of the usual evidence of shared financial responsibilities, such as paying rent or a mortgage together or on one another's behalf. This is not to say, however, that there was no evidence of cohabitation. Williams had a place to live when he met Shortridge and invited her to join him in living there. Although the unit in question actually belonged to Williams' other girlfriend, he provided housing for Shortridge when he asked her to live there with him, and she did so for one month. For her part, Shortridge provided transportation for the couple by borrowing family members' cars, and she testified that her grandmother had given her some money during that period, which she had used to buy food for herself and for Williams. Guided by common sense and ordinary human experience, the average person could have concluded from this evidence that Williams and Shortridge had shared their familial and financial responsibilities, insofar as they had any, and that Shortridge was a person living as Williams' spouse for purposes of a domestic violence conviction. See State v. Miller (Aug. 11, 1995), Washington App. No. 95CA8, unreported.
The second assignment of error is overruled.
 III. DEFENDANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE PREJUDICED BY THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.
Williams claims that his attorney acted ineffectively when he stipulated to the fact that Williams had been previously convicted of a domestic violence offense.
Williams concedes that the jury was required to determine whether he had been previously convicted of domestic violence. Thus, he does not object to the fact that evidence was presented on this issue; rather, he apparently contends that the manner in which this information was presented to the jury was prejudicial. We are unpersuaded. Because it does not appear that there was any genuine dispute regarding the existence of the prior conviction, trial counsel could have made a sound, strategic decision that it would be to Williams' advantage to stipulate to the conviction rather than to have the state introduce evidence about it. We fail to see how Williams could have been prejudiced by this decision, and the decision certainly did not fall below an objective standard of reasonableness.
The third assignment of error is overruled.
The judgment of the trial court will be affirmed.
 _________________ WOLFF, J.
BROGAN, J. and YOUNG, J., concur.