[Cite as *State v. Devore*, 2018-Ohio-4189.]

COURT OF APPEALS
ASHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff - Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| ADAM M. DEVORE | : | Case No. 18-COA-011 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:        Appeal from the Ashland County
Court of Common Pleas, Case No.
17-CRI-002

JUDGMENT:        Affirmed

DATE OF JUDGMENT:        October 15, 2018

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

CHRISTOPHER R. TUNNELL            MATTHEW J. MALONE
Ashland County Prosecuting Attorney     The Law Offices of Matthew J. Malone, LLC
                                        10 East Main Street
By: VICTOR R. PEREZ                     Ashland, Ohio 44805
Assistant Prosecuting Attorney
110 Cottage Street
Ashland, Ohio 44805

*Baldwin, J.*

{¶1}    Defendant-appellant Adam M. Devore appeals his conviction and sentence from the Ashland County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}    On January 12, 2017, the Ashland County Grand Jury indicted appellant on one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree, and one count of domestic violence in violation of R.C. 2919.25(A), a felony of the third degree.  At his arraignment on January 13, 2017, appellant entered a plea of not guilty to the charges.

{¶3}    On March 6, 2017, appellant's counsel filed a written plea of not guilty by reason of insanity.  On August 14, 2017, appellant's counsel withdrew the same and the matter was scheduled for trial.

{¶4}    Appellant, on October 30, 2017, filed a pro se motion seeking to remove his court-appointed counsel and represent himself. The trial court held a hearing on the motion on November 13, 2017 and, at the hearing, advised appellant about the consequences of proceeding without counsel. Appellant executed a written Waiver of Counsel that was filed on November 13, 2017. The trial court appointed appellant's former attorney as stand by counsel and the matter proceeded to a jury trial on January 9, 2018.

{¶5}    At the trial, the alleged victim testified. The victim testified that she had been living at 194 Sharon Avenue in Ashland, Ohio with her two children for about five or six years. The victim had a ten year old daughter and an eight year old son. She testified that she knew appellant because she had played in a band with him and started dating him when they were both 17 years old. The two reconnected a few year ago when they started

playing in a band together and started dating again. According to the victim, the two of them were getting "closer and closer" and, in April of 2016, began having sexual relations. Trial Transcript at 28[1].

**{¶6}** The victim testified that in early May of 2016, appellant started staying with her every night at her house on Sharon Avenue. Appellant had his clothes, drum sets and a record player there and while the victim washed his clothes, appellant helped with cooking and making sure that the house was tidy. Appellant also gave the victim money for cigarettes, beer and groceries. For the most part, appellant took care of the household while the victim worked.

**{¶7}** The victim testified that she started noticing how racist appellant was and that while they were at a bar, appellant became irate with a group of African-Americans who were playing rap music on the jukebox. The victim testified that she "thought that shit would hit the fan" and talked appellant into leaving. Transcript at 31. On the way home, appellant started screaming at the victim and called her a "nigger lover" because she had stood up to him. Transcript at 31. According to her, appellant knew that before dating appellant she had "messed around" with a biracial individual. Transcript at 31. Appellant then hit her. The following testimony was adduced when the victim was asked what happened after appellant hit her:

**{¶8}** A: He kept saying that you are a nigger lover, say it, and he said that I will give you one more fucking time, and I better fucking answer him, and he held my face and stood there, and I kept walking on home, and I don't know if was cold out, but when we got home, it was large argument. Him telling me that I was worthless, no white man

---

[1] References to the transcript, unless otherwise indicated, are to the copy of the trial court trial transcript in the court file.

would ever fucking want me, and I was a disgrace to the white nation, and he told me that night if I did not message this guy and tell him what a disgrace I am for what I had done, that he would leave.

And I did not care if he left, so he went on a good amount of time about it and kept looking at me and through gritted teeth telling me how gross I was.

What else do I need to talk about?

**{¶9}**   Q:  When was that?

**{¶10}**  A:  October.

**{¶11}**  Q:  What happened after that incident?

**{¶12}**  A:  He left the next day, because I was not talking to him, so he kind of got - - he just left.

**{¶13}**  Transcript at 32-33.

**{¶14}**   The victim had appellant's property removed from the house.

**{¶15}**  Shortly after the incident, appellant told the victim that he was in Mansfield and needed money for cigarettes.  When the victim then went to put money into the mailbox for appellant, appellant was standing up against her front porch and came into the house. The victim testified that she was scared of him at that point and that appellant denied hitting her and said that "I could do it the easy way  or hard way, and it doesn't matter if I break up with him or not, he get what he wants when he wants it." Transcript at 34.   Appellant told the victim that women are property and that once they were his, they were his.  Appellant moved back into the victim's house, but never brought his clothes or drums back. She testified that he stayed every night and that they played music, watched movies and regularly had sexual relations. The victim again was paying the bills while

appellant cleaned and cooked. The two slept on the couch in the living room and her children each slept in their own rooms. The bedrooms were close to her couch. The victim testified that appellant became very controlling and possessive of her.

{¶16} The victim testified that on or about January 6, 2017, she had testified on appellant's behalf in Ashland Municipal Court and that and appellant was found guilty of assaulting his wife's boyfriend in such case. Appellant was upset and tense and the victim tried to make him feel better by listening to music and playing music while she was doing laundry in the basement. Both appellant and the victim were drinking and had had four beers. Appellant then put in a movie, "12 Years a Slave", and appellant "went off a tangent again just about how disgusting black people are and disgusting niggers." Transcript at 46-47. The victim was concerned because her children were home and warned appellant to stop talking in such a manner. She told appellant to leave and that she did not want to see him again, but appellant refused to leave because he had been drinking. The victim decided to go to sleep on the couch.

{¶17} The victim testified that, on January 8, 2017, she woke up not being able to breathe very well while appellant was strangling or hitting her and yelling at her. He was holding her by the neck. The victim testified that she was trying to push appellant off of her and that he had his hand around her throat and his arm was up on her throat and he was hitting her with his fists all over. She testified that appellant was trying to tire her out by hitting her and that he got off of her and he sat on the other end of the couch while screaming at her. She testified that whenever she tried to speak, appellant would go off on her and that he held her hair down and "said that I am not going to look at any more

niggers, and he poked his finger down in my eye socket." Transcript at 49. The victim

testified as follows when asked what else appellant did to her:

**{¶18}**  A:  Okay, at one point, I asked what he was doing, and he said - - and I said,

why are you doing that, and he said after I went to sleep I got madder and madder thinking

about it, and you told me to leave because you would rather fuck a nigger than someone

that acts like you, I told him at one point, I would rather fuck a nigger and that is what

stoked him up thinking about it.

**{¶19}**  Q:  And how was he acting at that point, Heather [the victim]?

What was he doing to you?

**{¶20}**  A:  At one point he kept saying, you like nigger dicks and I'll show you what

it's like, and he pulled my pants down and I was getting my arm lose and I was trying to

pull them up, and he was trying to pull them down, and he started punching my vagina

and hitting it and pushing his fist in it, and he said I will show you what a nigger dick feels

like.  And he put his fingers up in me and was pushing hard, and I don't know if he was

trying to get a bunch of his fingers in there, I could not tell, but it hurt and I was pushing

him off.

**{¶21}**  Q:  Was that through your pants?

**{¶22}**  A:  No, my pants were down and I got them up once, and he got them down.

**{¶23}**  Q:  He pulled your pants down?

**{¶24}**  A:  Yes.

**{¶25}**  Q:  And that is when he started punching you in the vagina?

**{¶26}**  A:  Uh-huh.

**{¶27}**  Transcript at 49-50.

{¶28} According to the victim, appellant said that he had lost his kids and lost the assault case and that he had nothing else to lose and that the victim was going to die. The victim testified that she believed appellant and that she felt like appellant was trying to put his whole fist up her vagina and "grabbed it like he was trying to rip my vagina." Transcript at 51. The victim asked appellant to stop and told him that she loved him and did not want him to leave in order to trick him to stop. However, appellant said that she was lying and that he did not want her back. Appellant held her down by her hair or neck and was on top of her part of the time. Appellant, according to the victim, would also for a minute sit at the edge of the couch and stare at the victim while shaking his head and telling her that she was gross and disgusting.  When appellant asked her why she would tell him to leave and get out of the house if she wasn't lying, the victim told him that she was insecure and afraid that appellant was going to leave her first. The victim testified that she begged appellant to lay down with her because she was scared and was afraid that he was going to kill her. After the two laid down on the couch, appellant told her that she could not get off of the couch. She testified that appellant "eventually put his arm around my neck and head when I sleep, and he did that, and he said, I am sorry, honey, I am the devil sometimes." Transcript at 55. Since appellant did not fall asleep, the victim was unable to get out of the house.

{¶29} The victim testified that the next morning, one of her kids was sick and puked and that appellant did not allow her to take care of her sick child, but told her that he would take care of the child and the victim. Appellant asked the victim if they were all right and she indicated that they were. Shortly thereafter, appellant picked the victim up and put her in the shower. She testified that he washed her from top to bottom while telling

her that he loved her. After the victim did not respond, appellant became aggressive again and the victim became scared. She testified that, in order to prove that she loved him, she had sex with appellant in the shower although she did not want to do so. After the shower, appellant let the victim get clothes from the basement for herself and get dressed. She testified, when asked if she tried to get help, that she was scared to touch her phone and that it was not in the basement, but was behind the couch on a table the whole time. Appellant told her that she needed to stay on the couch and that he was going to take care of her. She testified that she told her children that she was sick and that the only time that she was allowed to get off the couch was to go to the bathroom.

{¶30} On January 9, 2017, appellant ran out of cigarettes and told the victim that he was going to quit smoking. The victim was scared because appellant smoked a lot and she thought that if he quit smoking, then she was not going to live. She testified that he told her that "He had nothing to lose, his killing spree was going to get started." Transcript at 60. The victim stayed on the couch and appellant proceeded to have sex with her.

{¶31} On January 9, 2017, appellant left the victim's home to get cigarettes. Once appellant was gone and she could not hear his truck engine anymore, the victim and her two children left the residence and went to her parents' home a few doors down and called 911. The victim testified that she went to her parents' house through back yards in case appellant came back early. After the police arrived, the victim went to the police station where photographs were taken and then her ex-husband drove her to the hospital. The victim testified that as a result of the attack on January 7, 2017, she was bruised under her eye and on the top of her head and her sides and had a busted lip. She also had bruising on her neck and broken blood vessels and her tooth went through her lip. The

victim testified that, at the hospital, she complained because her vagina was sore and tender and that she had a scratch on her back and bruising on her arm and on her breast. When she returned home, the victim gathered up appellant's belongings, including clean clothes, records, and pictures, and put them in his car.

{¶32} L.H., the victim's daughter, testified at trial for the State. She tested that appellant was staying with her mother, brother and herself in January of 2017 and that he stayed there "[a]ll of the time." Transcript at 169. She testified that appellant stayed overnight, did "fun" stuff with them and used to wake her up in the morning.

{¶33} L.H. testified that on the night her mother asked her to run to her grandparents' house, her mother, the victim, was "really, really scared." Transcript at 171. She further testified that they went through the backyard, which was not normal. On cross-examination, L.H. admitted that she never saw appellant harm or yell at her mother.

{¶34} Teresa Schneider, a certified nurse practitioner at University Hospital Medical Center, testified that she examined the victim on January 9, 2017. She testified that the victim was very tearful and upset and she recalled that the victim had bruises on her head and face, but did not have tenderness, swelling, bruising or marks to her groin area. Schneider testified that the victim had tenderness in the opening of the vagina, to the left side labia and on her inner left thigh. She testified that the victim did not display any swelling, inflammation or tenderness to the uterus and did not have any trauma or tears between the vagina and rectum. The victim had reported being hit with a fist and having fingers in her vagina. On cross-examination, Schneider testified that she did not view any sexual trauma that would make her want to initiate a colposope, which is a

microscope used to look at the cervix, and that they did not have one. She testified that the victim stated to her that there was no penis in her vagina.

{¶35} The next witness to testify was Elaine Siewert, the SAFE (Sexual Assault Forensic Examining) nurse at University Hospital in Ashland. Siewert testified that, on January 9, 2017, she examined the victim and the victim had a "sad appearance, flat affect and [was] calm, no smiles during the entire exam." Transcript at 193. The victim had bruising on her face and complained of soreness on the right hip. Siewert testified that she did not observe any injuries or major trauma to the patient. On cross-examination, she testified that she did not observe any bruising, scratches or abrasions in the vaginal area or any bruising to the legs. She testified that the victim had soreness to her buttocks.

{¶36} Officer Abraham Neumann of the City of Ashland Police Department testified that, on January 9, 2017, he responded to a domestic violence complaint at 224 Sharon Avenue along with Sergeant Darcy Baker. He testified that he observed appellant leaving 194 Sharon Avenue in a truck and proceeded to make a traffic stop of the truck. When he asked appellant if there had been any arguments between appellant and the victim, appellant said that there had not been any verbal or physical arguments and that he was leaving to get cigarettes. Appellant, who did not appear to be upset, was arrested. On cross-examination, Officer Neumann testified that he did not notice any injuries to the victim and that none were mentioned in his report. He testified that the victim did not say anything directly to him. On redirect, he testified that his conversation with the victim was maybe 30 seconds, that he did not stand there and examine the victim from head-to-toe and that they were redirected to 194 Sharon Avenue.

{¶37} Sergeant Darcy Baker testified next. He tested that when he arrived at 224 Sharon Avenue on January 9, 2017, he spoke with the victim who told him that appellant was at 194 Sharon Avenue. He tested that the victim was "wide-eyed and pacing and frantically pointing toward that area," Transcript at 221. He then walked on foot to 194 Sharon Avenue where Officer Neumann had detained appellant and then returned to 224 Sharon Avenue to meet with the victim to discuss what had happened. He testified that she was "highly upset". Transcript at 222. Sergeant Baker testified that the victim told him that it was both a physical assault and a sexual assault and showed him a bruise on the inside of her lip. The victim told him that "she had been in the house with him [appellant] since Saturday evening, and this was the first opportunity that she had to escape and call for help." Transcript at 223- 224. The victim also told him that appellant was trying to put his fist in her. While the victim described bruising and swelling to the inside of her upper lip, he did not know of any other injuries. However, when Sergeant Baker took the victim to the police station to interview her and photograph her injuries, he noticed bruising on the victim's face, neck and chest area and right forearm and broken blood vessels. When he spoke with appellant, appellant acknowledged that he and the victim bickered about racial issues, but denied that there was any physical confrontation. The interview between Sergeant Baker and appellant was recorded and the recording was played for the jury.

{¶38} On cross-examination, Sergeant Baker testified that during his initial encounter with the victim, he had not observed any injuries. He testified that the victim told him that appellant lived with her and that she had been held against her will by appellant. He further described the attack as "vicious" Transcript at 261. Sergeant Baker

testified that he had not observed any blood in the house and that there were not rips or tears to the pants or shirt that the victim had been wearing or blood on the pants. The Sergeant testified that the victim told him that appellant was snoring on Sunday night. When asked whether, during his interview of the victim, she ever stated that appellant told the victim that she could not leave, he stated that he did not "recall her stating that at the time of the assault, yes. During the next two days, her statement was, it was a feeling that she had." Transcript at 272. Sergeant Baker also testified on cross-examination that the victim was up and about and using the bathroom during the incident. He further testified that during his first interview of the victim, she told him that she had been held against her will and that while the victim could have used her phone to call the police, she did not. He testified that she told him that she did not call the police or her parents because she was afraid of what appellant might do. There also was testimony that appellant asked the victim to leave her house and get him cigarettes. During his interview with appellant, Sergeant Baker never documented any injuries to appellant, defensive or otherwise, because appellant had no visible injuries and made no claim. He further admitted that during the interview, appellant told him that he lived on Grove Avenue with his friend. He testified that appellant spent ninety percent (90%) of his time at the victim's house.

{¶39} After Sergeant Baker's testimony, the State rested pending the admission of exhibits. During the discussion of exhibits[2], the trial court advised the State that it was going to deny the admission of certified exhibits pertaining to appellant's prior domestic violence convictions because "we don't' have personal identifiers to link them to the identify [sic] [of] the Defendant." Transcript at 318. However, the trial court permitted the

---

[2] The exhibits were a certified copy of appellant's domestic violence conviction from West Virginia in 2010 and a 2012 conviction in Richland County case for intimidation.

State to reopen its case and present testimony relating to appellant's prior convictions. After Sergeant Baker testified regarding appellant's personal identifiers (i.e. appellant's date of birth and social security number), the trial court admitted the exhibits of appellant's prior domestic violence convictions over appellant's objection.

{¶40} Appellant did not testify at trial or present any evidence. The jury, following deliberations, on January 11, 2018 acquitted appellant of rape, but convicted him of abduction and domestic violence.

{¶41} The trial court, as memorialized in a Judgment Entry filed on February 27, 2018, sentenced appellant to 36 months in prison on the abduction conviction and to 36 months in prison on the domestic violence conviction. The trial court ordered that the sentences be served consecutively to one another for an aggregate prison sentence of 72 months.

{¶42} Appellant now raises the following assignments of error on appeal:

{¶43} "I. WHETHER APPELLANTS' CONVICTION FOR ABDUCTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THE ALLEGED VICTIM WAS FREE TO LEAVE HER HOME."

{¶44} "II. WHETHER APPELLANT'S CONVICTION FOR DOMESTIC VIOLENCE WAS SUPPORTED BY SUFFICIENT EVIDENCE WHEN THE RECORD WAS DEVOID OF EVIDENCE THAT APPELLANT WAS A "FAMILY OR HOUSEHOLD MEMBER" OF THE ALLEGED VICTIM."

{¶45} "III. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING THE STATE TO REOPEN ITS CASE TO PRESENT ADDITIONAL EVIDENCE WHEN THE STATE PROVIDED NO JUSTIFICATION FOR DOING SO."

{¶46} "IV.  WHETHER  THE  RECORD  SUPPORTED  MAXIMUM  AND CONSECUTIVE SENTENCES."

I

{¶47} Appellant, in his first assignment of error, argues that his conviction for abduction was against the manifest weight of the evidence.

{¶48} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997–Ohio–52, 678 N.E.2d 541, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).

{¶49} Appellant was convicted of abduction in violation of R.C. 2905.02(A)(2). Such section states as follows: "(A) No person, without privilege to do so, shall knowingly do any of the following: "(2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]"

{¶50} At trial, the victim testified that, on January 8, 2017, she woke up not being able to breathe very well while appellant was strangling or hitting her and yelling at her. He was holding her by the neck. The victim testified that she was trying to push appellant off of her and that he had his hand around her throat and his arm was up on her throat and he was hitting her with his fists all over.  She testified that appellant told her that he had nothing left to lose and that she was going to die, causing her to fear for her life.  At

one point, appellant had the victim down by her hair against the couch. The victim testified that appellant told her that she could not get off of the couch. She testified that he told her that "He had nothing to lose, his killing spree was going to get started." Transcript at 60. The victim stayed on the couch and appellant proceeded to have sex with her. When Sergeant Baker was questioned by appellant about whether the victim said that she was held against her will, he responded that she had and the following testimony was adduced:

**{¶51}** Q. Could you give me the round about area where you have the statement there, could you find that for me?

**{¶52}** A. She describes- -when she described the initial assault, waking up in the middle of the night, and she was trying to get away, and you push her down and hold her down by her upper chest, and was choking her neck. I don't think that she feels that she was free to leave.

**{¶53}** Transcript at 276. The victim further testified that she did not call the police or her parents out of fear that something would happen to either her, her children or her parents. She told the police that appellant was a "vicious fighter" and was strong and that she was concerned about the danger that he posed. Transcript at 278.

**{¶54}** In short, we find that the jury did not lose its way in convicting appellant of abduction. There was testimony that appellant restrained the victim's' liberty by telling her to staying on the couch on January 8, 2017 and placed her in fear for her life by his actions and comments. Appellant created a risk of physical harm to the victim by strangling her and assaulting her placed her in fear for her life by his actions and comments.

**{¶55}** Appellant's first assignment of error is, therefore, overruled.

II

{¶56} Appellant, in his second assignment of error, contends that his conviction for domestic violence is against the sufficiency of the evidence.

{¶57} In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. It is well-established that the State bears the burden of establishing each and every element of a charged crime and must do so with proof beyond a reasonable doubt. See In re L.R., 8th Dist. Cuyahoga No. 93356, 2010–Ohio–15, ¶ 11.

{¶58} R.C. 2919.25(A) states as follows: "No person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶59} Appellant maintains that there was no evidence that he was a "family or household" member of the victim. "Family or household member" includes, "A spouse, a person living as a spouse, or a former spouse of the offender" R.C. 2919.25(F)(1)(a)(i). A "person living as a spouse" includes "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2).

{¶60} In State v. Williams, the Ohio Supreme Court addressed the definition of "cohabitation" as follows:

**{¶61}** [W]e conclude that the essential elements of "cohabitation" are (1) sharing of familial or financial responsibilities and (2) consortium. R.C. 2919.25(E)(2) and related statutes. Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact.

**{¶62}** 79 Ohio St.3d 459, 465, 1997-Ohio-79, 683 N.E.2d 1126. *See also, State v. Martin,* 5th Dist. Tuscarawas No. 2015AP0010, 2016-Ohio-225, 57 N.E.3d 411, ¶ 22.

**{¶63}** The Court further defined cohabitation in *State v. McGlothan*, finding where the state demonstrated the defendant was the victim's boyfriend and they had lived together for about a year, the state had no obligation to demonstrate the sharing of familial or financial responsibilities and consortium to prove cohabitation. 138 Ohio St.3d 146, 149, 2014-Ohio-85, 4 N.E.3d 1021, ¶ 15. *Martin,* 2016-Ohio-225, ¶ 23.

**{¶64}** We have found, pursuant to R.C. 2919.25(F), if testimony establishes the parties were presently living together at the time of the offense and had cohabitated within the past five years, such unrefuted testimony is sufficient to establish the complaining witness was appellant's family or household member. *State v. Avery*, 5th Dist. Stark No. 2004–CA–00010, 2004-Ohio-5226, 2004 WL 2260575, ¶ 41. *See also, Uhrichsville v. Losey,* 5th Dist. Tuscarawas No. 2005 AP 030028, 2005-Ohio-6564, 2005 WL 3361100; *State v. Martin,* 2016-Ohio-225, ¶ 24.

**{¶65}** Applying the *McGlothan* analysis to the facts of the instant case, we find sufficient evidence exists that appellant was a family or household member. There was testimony that appellant was the victim's boyfriend and they lived together for about a year. The victim testified that appellant had been staying every night at her house since May of 2016 and that he did chores around the house like cleaning and cooking while the victim worked. Appellant and the victim started having sexual relations in April of 2016 and the victim testified that he gave her money sometimes for beer and cigarettes or food for a meal. Appellant left the victim's house in October of 2017, but later showed up at her house and moved back in. The victim testified that he stayed at her house every night thereafter and that while she again supplied the money for the household, he cleaned and cooked. The two also engaged in sexual relations on a regular basis. There was testimony that appellant spent 90% of his time at the victim's house.

**{¶66}** Based on the foregoing and the facts set forth in detail above, we find that any rational trier of fact, construing the evidence in a light most favorable to the prosecution, could have found the essential elements of the crime of domestic violence proven beyond a reasonable doubt.

**{¶67}** Appellant's second assignment of error is, therefore, overruled.

III

**{¶68}** Appellant, in his third assignment of error, contends that the trial court abused its discretion in permitting the State to reopen its case to present additional evidence.

**{¶69}** It has been previously held that a determination of whether to permit the State to reopen its case after it has rested is within the sound discretion of the trial court. See *City of Columbus v. Grant*, 1 Ohio App.3d 96, 439 N.E.2d 907 (1981).

**{¶70}** Appellant argues that, if the trial court had discretion to permit the State to reopen its case, it abused that discretion. To constitute an abuse of discretion, a trial court's decision must be unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶71}** In the case sub judice, at trial, the trial court sua sponte advised the State that the exhibits of appellant's certified prior domestic violence convictions were not going to be admitted because the State had failed to elicit sufficient personal identifying information to link the convictions to appellant. Appellant had not objected to the admission of the exhibits. The State then rested pending admission of the exhibits, but later moved to reopen the case so that Sergeant Baker could "provide the identifiers." To tie the convictions to appellant. Transcript at 337. The trial court then heard from both parties  regarding the motion to reopen and then permitted the State to reopen its case stating, in relevant part, as follows:

**{¶72}** "There is no argument here that the Defendant is not the individual identified in the prior convictions, it's just a question of whether the State provided enough information so if the Court did grant the admission, whether it's sufficient evidence to survive an appeal, and there is limited identification, but the Court found it wasn't sufficient to meet the State's Light standard, so not talking about something out in left field that wasn't the Defendant and the Defendant had copies, I am presuming discussed during Discovery and he had an opportunity to challenge veracity, and that did not occur on

direct, and taking all of the concerns, I am not happy to get to this point, I think it was a deficiency of the evidence, and I am going to find that in the interest of justice, should allow the State to reopen the case, and if Sergeant Baker is able to testify, we will take him before proceeding with the Defendant's case in chief."

**{¶73}** Transcript at 343. Sergeant Baker then testified about appellant's prior convictions for domestic violence and provided identifiers tying them to appellant.

**{¶74}** We find that the trial court did not abuse its discretion in permitting the State to reopen its case because the trial courts' decision was not arbitrary, unconscionable or unreasonable.

**{¶75}** Appellant's third assignment of error is, therefore, overruled.

IV

**{¶76}** Appellant, in his fourth assignment of error, contends that the record does not support maximum and consecutive sentences.

**{¶77}** We review felony sentences not for an abuse of discretion, but rather using the standard of review set forth in R.C. 2953.08. *State v. Marcum*, 146 Ohio St.3d 516, 2016–Ohio–1002, 59 N.E.3d 1231, paragraph 22. R.C. 2953.08(G)(2) provides we may either increase, reduce, modify, or vacate a sentence and remand for resentencing where we clearly and convincingly find that either the record does not support the sentencing court's findings under R.C. 2929.13(B) or (D), R.C. 2929.14(B)(2)(e) or (C)(4), or R.C. 2929.20(I), or the sentence is otherwise contrary to law.

**{¶78}** Pursuant to *Marcum*, this Court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that: (1) the record does not support the trial court's findings under relevant statutes, or (2) the sentence is otherwise

contrary to law. Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, 161 Ohio St. at 477, 120 N.E.2d 118.

{¶79} As long as the sentence is within the statutory range for the offense, and the court considers both the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the seriousness and recidivism factors set forth in R.C. 2929.12, a trial court's imposition of a maximum prison term for a felony conviction is not contrary to law. *State v. Keith*, 8th Dist. Cuyahoga Nos. 103413 and 103414, 2016–Ohio–5234, 2016 WL 4141260, ¶ 10, 16.

### Consecutive Sentences

{¶80} R.C. 2929.14 (C)(4) states as follows:

{¶81} (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

{¶82} (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to

section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

**{¶83}** (b)  At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

**{¶84}** (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶85}**  In *State v. Bonnell*, 140 Ohio St.3d 209, 2014–Ohio–3177, 16 N.E.3d 659, syllabus, the Supreme Court of Ohio held: "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. § 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings."

**{¶86}** In the case sub judice, appellant does not dispute that his sentences for Count Two (Abduction) and Count Three (Domestic Violence) were within the statutory range and that the trial court made the findings necessary under R.C. 2929.14(C)(4) to impose consecutive sentences. Rather, he argues that his maximum and consecutive sentences were "strikingly inconsistent with Ohio sentencing guidelines".

**{¶87}** R.C. 2929.12 provides, in relevant part, as follows:

**{¶88}** (A)   Unless otherwise required by section 2929.13 or 2929.14 of the Revised Code, a court that imposes a sentence under this chapter upon an offender for a felony has discretion to determine the most effective way to comply with the purposes

and principles of sentencing set forth in section 2929.11 of the Revised Code. In exercising that discretion, the court shall consider the factors set forth in divisions (B) and (C) of this section relating to the seriousness of the conduct, the factors provided in divisions (D) and (E) of this section relating to the likelihood of the offender's recidivism, and the factors set forth in division (F) of this section pertaining to the offender's service in the armed forces of the United States and, in addition, may consider any other factors that are relevant to achieving those purposes and principles of sentencing.

{¶89} (B) The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is more serious than conduct normally constituting the offense:

{¶90} (1) The physical or mental injury suffered by the victim of the offense due to the conduct of the offender was exacerbated because of the physical or mental condition or age of the victim.

{¶91} (2) The victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense.

{¶92} (3) The offender held a public office or position of trust in the community, and the offense related to that office or position.

{¶93} (4) The offender's occupation, elected office, or profession obliged the offender to prevent the offense or bring others committing it to justice.

{¶94} (5) The offender's professional reputation or occupation, elected office, or profession was used to facilitate the offense or is likely to influence the future conduct of others.

**{¶95}** (6) The offender's relationship with the victim facilitated the offense.

**{¶96}** (7) The offender committed the offense for hire or as a part of an organized criminal activity.

**{¶97}** (8) In committing the offense, the offender was motivated by prejudice based on race, ethnic background, gender, sexual orientation, or religion.

**{¶98}** (9) If the offense is a violation of section 2919.25 or a violation of section 2903.11, 2903.12, or 2903.13 of the Revised Code involving a person who was a family or household member at the time of the violation, the offender committed the offense in the vicinity of one or more children who are not victims of the offense, and the offender or the victim of the offense is a parent, guardian, custodian, or person in loco parentis of one or more of those children.

**{¶99}** (C) The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is less serious than conduct normally constituting the offense:

**{¶100}**      (1) The victim induced or facilitated the offense.

**{¶101}**      (2) In committing the offense, the offender acted under strong provocation.

**{¶102}**      (3) In committing the offense, the offender did not cause or expect to cause physical harm to any person or property.

**{¶103}**      (4) There are substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense.

**{¶104}** According to appellant, the only "more serious" factors that applied in this case are 2929.12(B)(2), (B)(6), and (B)(9) and the following "less serious factors" applied: R.C. 2929.12(C)(2) and (C)(4).

**{¶105}** The trial court, in this matter, found that appellant met all three grounds under R.C. 2929.14(C)(4) for consecutive sentences. The trial court further stated that appellant had a prior felony domestic violence offense and failed to show remorse. The trial court stated on the record, in pertinent part, as follows: "you pretty much sentenced these victims to a life sentence of some sort in terms of the emotional abuse that you caused, and the emotional harm, let alone the physical, and I think based on your history and repeated activity of this, in this regard, also coupled with other offenses of violence, the assault offense, that you were subject to in Municipal Court at the time this happened, that consecutive service of any sentence that the Court imposes on Counts 2 and 3 are necessary to protect the public and punish you." Sentencing Transcript at 36-37. The trial court noted that appellant had a history of criminal conduct and that appellant had committed both offenses while subject to the sanctions of Municipal Court.  The pre-sentence investigation report indicates that appellant has prior convictions for intimidation, disorderly conduct, and resisting arrest, among other offenses.

**{¶106}** Based on the foregoing, we find that appellant's sentence was supported by the record.

**{¶107}** Appellant's fourth assignment of error is, therefore, overruled.

**{¶108}**        Accordingly, the judgment of the Ashland County Court of Common Pleas is affirmed.

By: Baldwin, J.

Gwin, P.J. and

Hoffman, J. concur.