[Cite as *State v. Fanelli*, 2022-Ohio-3498.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                            Court of Appeals No.  WD-21-082

       Appellee                                       Trial Court No.  2021CR0186

v.

George O. Fanelli                                   **DECISION AND JUDGMENT**

       Appellant                                       Decided:  September 30, 2022

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Jeffrey P. Nunnari, for appellant.

* * * * *

**DUHART, P.J.**

{¶ 1} This matter is before the court on the appeal filed by appellant, George

Fanelli, from the October 27, 2021 judgment of the Wood County Court of Common

Pleas.  For the reasons that follow, we affirm.

{¶ 2} Appellant sets forth three assignments of error:

I. The trial court erred to the prejudice of appellant by failing to grant his

motions for judgment of acquittal.

II. Appellant's conviction for domestic violence is unsupported by sufficient evidence.

III. Appellant's conviction for domestic violence is against the manifest weight of the evidence.

## Background

{¶ 3} On January 19, 2021, appellant called 911 and reported that T.A., his on-again, off-again girlfriend, had hit him and damaged a garage at his apartment complex. Police responded, and initially charges were filed against T.A. However, following further investigation by police, appellant was indicted on one count of domestic violence, a third-degree felony due to his previous domestic violence convictions.

{¶ 4} On August 4, 2021, a jury trial commenced in the Wood County Court of Common Pleas. The state presented its case and after resting, defense counsel moved for acquittal pursuant to Crim.R. 29, which motion was denied. The defense then offered testimony and evidence. Thereafter, the jury found appellant guilty of domestic violence.

{¶ 5} On October 25, 2021, a sentencing hearing was held, where appellant was sentenced to 24 months in prison, followed by one to three years of post release control. Appellant timely appealed.

## Trial

{¶ 6} The state called five witnesses. The first witness was Perrysburg Police Officer Jacob McConnell, who testified to the following. He has been employed with the Perrysburg Police Division since January 13, 2021, as a patrol officer. Prior to that, he

2.

was employed with a police agency for the city of Waterville from 2018, until he was hired by Perrysburg. On January 19, 2021, he was working and received a dispatch to go to an apartment on Roachton Road, in Perrysburg, Wood County, Ohio. A male 911 caller said his "[g]irlfriend got drunk and disorderly, hit caller, and then backed her vehicle into a garage and then left the scene."

{¶ 7} It was dark outside when Officer McConnell arrived at the apartment. There were two people in the apartment, appellant and Tim Bockbrader ("Tim"). The officer spoke with appellant, who was the 911 caller. Appellant looked normal, calm, not in distress and had no apparent injuries, and the apartment did not look destroyed and nothing looked misplaced.

{¶ 8} Appellant told the officer the following. He and his girlfriend, T.A., went to Basil, a restaurant, where they had two drinks and pizza, and were trying to work on things as they had issues in the past. After dinner, they returned to appellant's apartment, as T.A. was under the impression that appellant was going to pay her back money appellant owed her. T.A. started to raise her voice so appellant asked her to leave. She kept elevating her voice and slapped appellant across the face. She left the apartment, got in her truck, backed into a garage and departed.

{¶ 9} Appellant gave the officer T.A.'s phone number, and the officer took pictures of appellant's face and the garage. The officer tried to call T.A. that night, but there was no answer, so he left a voice mail. Charges were filed that night against T.A., based on what appellant had said.

3.

{¶ 10} On January 21, 2021, T.A. called the officer and gave her statement. She said she was assaulted by appellant, and she emailed pictures of herself to Officer McConnell. Thereafter, the investigation continued, primarily by Sergeant Duran.

{¶ 11} The next witness, D.A., who is T.A.'s grandmother, testified to the following. T.A. arrived at D.A.'s house, in Northwood, Ohio, on January 20, 2021, between 11:00 a.m. and noon. D.A. described T.A. as very distraught, "out of control of being upset," pacing, crying and she would not eat or sleep. T.A. was wearing long sleeves and her face was very red. The next day after T.A. took a shower, D.A. saw the bruises on T.A.'s arms, legs and face. T.A. took pictures of her bruises. T.A. told D.A. that the encountered happened around 9:30 p.m. on January 19, 2021.

{¶ 12} The third witness, Detective Ryan Merrow, testified to the following. He has been employed with Perrysburg Police Division for almost nine years, and in the detective bureau for about 13 months. He is a mobile device forensic examiner. He examined T.A.'s cell phone, starting with January 19, 2021, and working forward. He found images that appeared to be bruising on a female. The creation dates and capture dates of the original photos were the same, and were January 20 and 25, and February 1, 2021.

{¶ 13} The next witness, T.A., testified to the following. She knew of appellant for 20 to 30 years through other people, and described him as an acquaintance. She first met him at the end of June or beginning of July 2019, after he sent her a friend request on Facebook. When asked if the relationship between her and appellant turned romantic,

4.

T.A. responded, "Yes. We set up a date and he came to my house and then it just progressed from there." More specifically, she said they set up a date, he showed up at her house a day early, he spent the night and "he never kind of left until I asked him to leave." They lived together, on and off, for eight months from July 2019 until April 2020. After appellant left T.A.'s home, she would see him "very intermittent[ly]." T.A. described her relationship with appellant, in January 2021, as not "intensively romantic."

{¶ 14} On the evening of January 19, 2021, appellant contacted T.A., by text, and told her he had some money for her. He owed her $5,200 from August 2020. Appellant said if she wanted the money, she could come over to his apartment and get it. It was at least 8:50 p.m., going on 9:00 p.m., when T.A. drove over to appellant's apartment complex. Appellant was standing in a parking spot, and told her they were going across the street to have dinner. Appellant had "two drinks in hand * * * [h]e had these 'road cups.'" They went to Basil, shared a pizza and salad and had two drinks each. Afterward, appellant begged her to go up to his apartment, saying the money was upstairs and he had a surprise for her. She told him she was not going up there if his roommate, Tim, was there because Tim is not a very good person.

{¶ 15} Eventually, T.A. went up to appellant's apartment, he shut the door and Tim was in the kitchen. T.A. said, "[a]nd then I had words. And then it just turned into a verbal argument among the three of us." Appellant told T.A. she would get her money if she would participate in a lawsuit, and she said she was not doing that. There was arguing, "[a]nd the next thing I know I got punched in the face [by appellant] and fell to

5.

the ground." T.A. tried to get up but kept falling, so she crawled on the ground and screamed and yelled to get out of there. When she looked up, she "saw Tim over by the door standing there -- to get out." She "kept arguing and screaming and yelling * * * asking for help" while she "was being grabbed and kicked [by appellant] and all kinds of stuff." T.A. did not have her phone or purse with her, as she left them in her vehicle. She estimated she was in appellant's apartment for "8 minutes tops" before she was able to get out and go to her truck.

{¶ 16} Once in her truck, T.A. looked in the rearview mirror and saw appellant standing there behind her with his cell phone. She remembered "peeling out of there," turning onto Roachton Road, then Route 25, and eventually pulling over. She called her attorney, who did not answer, and made other phone calls before she reached Pete, appellant's ex-roommate. She talked to Pete and they decided to meet at Speedway gas station. Pete told her to follow him to his house, which she did. She spent the night on his couch.

{¶ 17} When T.A. woke up on January 20, 2021, about 7:00 a.m., she noticed she had several calls from appellant and a call from Officer McConnell. She called the officer back and was told that he was already off of his shift. She left Pete's house and drove home. She was able to talk with her attorney, who told her to go somewhere safe. T.A. went to her grandmother's house and she stayed until January 21, 2021, when she was arraigned in Perrysburg. Before going to court, T.A. took a shower at her grandmother's house and noticed all of her injuries. T.A. showed her grandmother her

6.

injuries, and T.A. took pictures of her injuries. T.A. identified pictures that she took of herself on January 20, 2021, while she was at her grandmother's house. The pictures showed bruises on her arm, knee and legs. She also had a black eye and bruises on her back and "butt."

{¶ 18} T.A. acknowledged she did not call 911 after leaving appellant's apartment, because she thought her attorney would be able to handle it. T.A. alluded to a prior incident, but she was unable to discuss the specifics of this incident.[1] She insisted she was not drunk on January 19, 2021, as she "had two of these martini lemon drop things that are watered down with simple syrup and that type of thing." They were "two cocktails, two small ones in a little martini glass. And we drank water and we ate."

{¶ 19} T.A. admitted that since the incident, she has exchanged text messages with appellant and has spoken with him on the phone, which calls were recorded when he was in jail. After some of the recorded phone calls were played for the jury, T.A. was questioned about them. T.A. said Tim, who was mentioned in a call, was Tim Bockbrader, who was present when the incident happened, and appellant called Tim a loser, liar and "piece of shit." T.A. said Tim was a drug addict and alcoholic.

{¶ 20} On cross-examination, T.A. was asked about appellant's past history of domestic violence offenses, and she responded she was only aware of one incident when

---

[1] The record indicates there were discussions off of the record regarding a prior incident. On the record, T.A. referred to another case, not in Wood County, and she mentioned "he [appellant] did this again" and "I'm told to just circle around the situation of what happened on January 11th prior to the January 19th incident."

7.

she first met him. She said she "didn't know about his entire criminal record that goes on for 20-plus years[,]" and she did not learn about all of them until the last incident. T.A. was then questioned about contacting Officer McConnell. She said she returned the officer's call and was able to speak with him for the first time on January 21, 2021. She told the officer about what happened on January 19, 2021, which was that appellant threatened her and held her hostage, and Tim was standing at the door when she was trying to leave.

{¶ 21} T.A. was asked why she did not want to go up to appellant's apartment on January 19, 2021, if Tim was there. T.A. replied "Tim sells drugs and [appellant] and him sell drugs together, and they have hookers."

{¶ 22} When asked about not calling 911, T.A. explained she was waiting for her attorney to advise her. She learned she had a warrant for her arrest and had to turn herself in, which she did with her attorney. T.A. said appellant "called the cops because he thought [she] was calling the cops." T.A. was asked if the reason she did not call the police was because she did not want to get an OVI for operating a vehicle under the influence of alcohol. T.A. said she did not think she was going to get an OVI, but appellant "was adamant that [she] was drunk and on drugs." T.A. had two drinks, but was not drunk.

{¶ 23} After the incident, T.A. did not communicate with appellant until March 2021.

8.

{¶ 24} T.A. went to urgent care about four days after the incident because she was having problems walking. She had an x-ray, as she was worried that something was wrong with her hip.

{¶ 25} The last witness called by the state was Sergeant Brenton Duran, who testified to the following. He has been employed with Perrysburg Police Division for about 14 years, and was previously a patrolman, detective and field training officer. He was working on January 19, 2021, and was dispatched to a domestic violence call at an apartment on Roachton Road, in Perrysburg, Wood County, Ohio. The 911 caller advised that a female was drunk, disorderly, hit the caller and left the scene in her truck.

{¶ 26} Within five to ten minutes, the police arrived at the apartment and Sergeant Duran learned the caller was appellant. Tim was also present at the apartment. Typically when the sergeant responds to domestic violence calls, both parties are present and excited, and there is tension. However, none of that was displayed by appellant or Tim. In addition, the apartment was orderly. Tim gave a very brief statement, which was lacking detail while appellant was very calm and collected, and he offered the sergeant something to eat and drink. Sergeant Duran has never had that happen at a domestic violence call. Appellant gave a statement saying he called the police because he wanted to protect himself as T.A. was liable to come over, attack him and then hit herself in the face and tell the police appellant did it. What appellant described was not a common experience that the sergeant has dealt with in domestic violence situations.

9.

{¶ 27} Sergeant Duran said T.A. was charged with domestic violence because appellant made the allegation of domestic violence and wrote out a statement, while Tim, who was a witness on the scene, said he saw T.A. slap appellant. Moreover, the police attempted to contact T.A. but were unable to reach her. In due course, the charges against T.A. were dismissed. T.A. talked to Officer McConnell and provided him with photos, then the officer and sergeant met with the prosecutor and told the prosecutor there was another side to the story. The prosecutor decided how to handle the case and move forward.

{¶ 28} T.A. provided her phone to the police, so police could look at the photographs and text messages between appellant and T.A. Thereafter, appellant was charged, as Sergeant Duran said the photos on T.A.'s phone "documented that there was an injury, [a]nd they were consistent with what she reported, which was being struck and kicked."

{¶ 29} On cross-examination, Sergeant Duran acknowledged there were inconsistencies in T.A.'s statement. The sergeant also admitted that appellant said he made the report but did not want T.A. to get into trouble.

{¶ 30} The state rested its case. Appellant moved, pursuant to Crim.R. 29, for a directed verdict of acquittal, which the trial court denied.

{¶ 31} The defense called Tim as a witness, and he testified to the following. He and appellant grew up in the same neighborhood in south Toledo. Tim lived with appellant, on January 19, 2021, at an apartment on Roachton Road in Perrysburg, Ohio.

10.

That night, at about 10:00 p.m., Tim was in his bedroom and was cooking a TV dinner in the microwave when appellant and T.A. came into the apartment. Tim heard the dinger and went to get his dinner. Tim was going to take his dinner back to his bedroom but T.A. asked him to sit at the table, so he did. Tim described T.A. as very loud and obviously intoxicated. It was not very long before appellant asked T.A. to leave because she was being very noisy. T.A. never screamed for help, she was just being loud and obnoxious. Tim saw T.A. take a swing at appellant, and slap appellant across the face, on the left side. A picture was taken, and Tim said appellant had a little gouge on his cheek or nose.

{¶ 32} Tim testified appellant did not strike or punch T.A., Tim did not punch T.A. or kick her while she was on the ground, as she was never on the ground. Tim did not hold T.A. against her will and not let her leave the apartment, nor did he block the door. Tim was not a victim of any assault that evening, nor did he participate in an assault. After T.A. left, three police officers arrived at the apartment. Tim talked to one of the officers and gave a written statement.

{¶ 33} On cross-examination, Tim said he was never charged with a crime as a result of the January 19, 2021 incident. Tim admitted it surprised him to hear that appellant thinks Tim is a liar, a drunk, and a loser. Tim stated he pays half of the rent and expenses for the apartment, and does not rely on appellant's family.

{¶ 34} The defense rested its case. The jury found appellant guilty. Appellant appealed.

11.

**First and Second Assignments of Error**

{¶ 35} In appellant's first assignment of error, he argues the trial court erred in failing to grant his motions for acquittal.[2] In the second assignment of error, appellant challenges the sufficiency of the state's evidence. Since these assignments of error present the same legal question, we will address them together. *See State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37 ("A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence.").

{¶ 36} In his first and second assignments of error, appellant argues the trial court erred in denying his Crim.R. 29 motions for judgment of acquittal and his conviction is not supported by sufficient evidence. He asserts he and T.A. did not live together at the time of the alleged incident, the state failed to adduce sufficient evidence that he and T.A. cohabited at all, given T.A.'s testimony about the mechanics of their relationship, and the state did not prove T.A. was a person living as a spouse with appellant at any point in time. In support, appellant cites to R.C. 2919.25, *State v. Williams*, 79 Ohio St.3d 459, 683 N.E.2d 1126 (1997), paragraph two of the syllabus, and *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, ¶ 15.

{¶ 37} The state counters the domestic violence statute does not require cohabitation at the time of the incident, rather, "the assailant and the victim needed to

---

[2] Appellant refers to multiple "motions," however, the record shows appellant only moved for a directed verdict of acquittal one time, after the state rested its case.

12.

cohabitate at some point within five years of the domestic violence incident." The state cites to R.C. 2919.25(A), (F)(1)(a)(i) and (F)(2), as well as numerous cases including *State v. Deer*, 6th Dist. Lucas No. L-06-1086, 2007-Ohio-1866, ¶ 27 and *State v. Pauley*, 6th Dist. Lucas No. L-18-1099, 2019-Ohio-2368, ¶ 21.

{¶ 38} The state maintains it is undisputed that appellant and T.A. lived together in T.A.'s house from July 2019 until February 2020, at which time they were romantically involved. The state further submits "the attack that precipitated [appellant's] prosecution occurred on January 19, 2021 * * * [t]hat is well within the five-year timeframe required by R.C. 2919.25(F)(2)."

**Law**

{¶ 39} Crim.R. 29(A) provides:

> The court on motion of a defendant * * * after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses.

{¶ 40} Sufficiency of the evidence is a legal standard which tests whether the evidence introduced at trial is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The proper analysis under a sufficiency of the evidence standard is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could

13.

have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 41} The domestic violence statute, R.C. 2919.25, provides in relevant part:

(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.

(B) No person shall recklessly cause serious physical harm to a family or household member.

* * *

(F) As used in this section and sections 2919.251 and 2919.26 of the Revised Code:

(1) "Family or household member" means any of the following:

(a) Any of the following who is residing or has resided with the offender:

(i) A spouse, a person living as a spouse, or a former spouse of the offender;

* * *

(2) "Person living as a spouse" means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.

14.

{¶ 42} In *McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, ¶ 15, the Supreme Court of Ohio noted the victim testified at trial that McGlothan was her boyfriend and they lived together for roughly a year in her residence.  The court found:

> Because the state demonstrated that the defendant was the victim's boyfriend and that they had lived together for about a year, the state had no obligation to demonstrate the sharing of familial or financial responsibilities and consortium to prove cohabitation in this case.  Instead, based on [the victim's] testimony, the trial court could have reasonably determined that the state established cohabitation and thus that [the victim] was a person living as a spouse with McGlothan.  Because the evidence also demonstrates that [the victim] resided with McGlothan at the time of the incident, the trial court could have reasonably concluded that [the victim] was a family or household member.  *Id.*

**Analysis**

{¶ 43} Upon review, appellant was charged with and convicted of domestic violence, the elements of which are that he knowingly or recklessly caused physical harm to a household member.  R.C. 2919.25(A).  Appellant only challenges the sufficiency of the evidence regarding T.A.'s status as a household member.  As such, we will limit our analysis to that element.

{¶ 44} The record shows at trial, the state presented T.A.'s unrefuted testimony that the parties were in a romantic relationship and lived together at her residence "on and

off, for eight months, from July 2019 until April 2020." Further, it is undisputed that the incident occurred on January 19, 2021.

{¶ 45} Viewing this evidence in a light most favorable to the state, we find any rational trier of fact could have found T.A. was a household member, as she was "a person living as a spouse" with appellant within five years of the incident. *See* R.C. 2919.25(F)(1) and (2). Since appellant did not challenge the sufficiency of the evidence with respect to the domestic violence elements of knowingly or recklessly caused physical harm, we find that any rational trier of fact, viewing the evidence in a light most favorable to the state, could have found each element of domestic violence proven beyond a reasonable doubt. *See* R.C. 2919.25(A) and (B). Consequently, the evidence was sufficient to support the conviction, and the trial court did not err in denying appellant's motion for acquittal. Accordingly, appellant's first and second assignments of error are not well-taken.

**Third Assignment of Error**

{¶ 46} Appellant asserts his conviction for domestic violence was against the manifest weight of the evidence. He contends, as he did in his first and second assignments of error, that he did not live with T.A. at the time of the alleged incident, that the state failed to adduce sufficient evidence that he and T.A. cohabited at all, given T.A.'s testimony about the mechanics of their relationship, and that the state did not prove that T.A. was "a person living as a spouse" with appellant at any point in time.

16.

Appellant claims the jury's guilty verdict was against the manifest weight of the evidence.

**Law**

{¶ 47} Weight of the evidence concerns

"the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Citation omitted.) *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶ 48} When analyzing a manifest weight of the evidence claim,

"[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Id.*

{¶ 49} In determining whether a verdict is against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror." *Id.* We reverse a conviction on

17.

manifest weight grounds for only the most "'exceptional case in which the evidence weighs heavily against the conviction.'" (Citation omitted.) *Id.*

### Analysis

{¶ 50} Upon review, appellant takes issue with his conviction for domestic violence being against the manifest weight of the evidence only in regard to T.A.'s status as a household member. We will limit our analysis accordingly.

{¶ 51} The record shows T.A. testified that she and appellant were in a romantic relationship and lived together at her residence "on and off, for eight months, from July 2019 until April 2020." T.A.'s testimony on this subject was never questioned or challenged at trial. Thus, T.A.'s testimony on this subject is undisputed. It is further undisputed that the incident occurred on January 19, 2021. The jury heard all of the testimony presented, and made a determination that T.A. was a household member, as she was "a person living as a spouse" with appellant within five years of the incident. *See* R.C. 2919.25(F)(1) and (2). We cannot say the jury lost its way and performed a miscarriage of justice when it decided that T.A. was a household member of appellant.

{¶ 52} Furthermore, in view of the fact that appellant did not claim his conviction for domestic violence was against the manifest weight of the evidence with respect to the elements of knowingly or recklessly caused physical harm, we cannot find the evidence weighed heavily against the conviction, or that a manifest miscarriage of justice occurred. Accordingly, appellant's third assignment of error is not well-taken.

18.

**{¶ 53}** The judgment of the Wood County Court of Common Pleas is affirmed.

Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Thomas J. Osowik, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.