[Cite as *Butcher v. Butcher*, 2024-Ohio-5795.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| DEETRA ANN BUTCHER, | : | APPEAL NO. | C-240247 |
|  |  | TRIAL NO. | DR-1601345 |
| Plaintiff-Appellee, | : |  |  |
| vs. | : | *O P I N I O N* |  |
| JOHN SCOTT BUTCHER, | : |  |  |
| Defendant-Appellant. | : |  |  |

Appeal From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 11, 2024

*Cathy Cook Law* and *Cathy R. Cook*, for Plaintiff-Appellee,

*Cornetet, Meyer, Rush & Spillane* and *Karen P. Meyer*, for Defendant-Appellant.

**BERGERON, Judge.**

**{¶1}** In this epilogue to a divorce decree, husband sought to modify or terminate spousal support based upon his belief that his ex-wife was cohabitating with another man. As this round of litigation sputtered to life, wife discovered that husband had been improperly hiding distributions from his company that he was obligated to pay her to the tune of about $95,000. Wife understandably sought to recover those funds, and the parties presented dueling motions to the domestic relations court. After reviewing all of the evidence, the magistrate ultimately determined that wife was not cohabitating with the other individual (thereby denying any modification to spousal support) and ordered husband to pay back the $95,000, decisions later adopted by the trial court. Husband now appeals to this court, asserting three assignments of error that essentially challenge the cohabitation finding (he leaves the $95,000 award alone). After reviewing the record, however, we agree with the trial court and accordingly affirm its judgment.

I.

**{¶2}** After 30 years of marriage and three children together, appellee-wife Deetra Butcher filed for divorce from appellant-husband John Butcher, and less than a year later, they finalized their divorce, and the trial court entered the decree of divorce. In connection with that resolution, the trial court ordered husband to pay wife $2,374 per month in spousal support along with 45 percent of S-Corp distributions from his landscaping business ("Tier II spousal support"). The decree specified that the "[s]pousal support shall terminate upon the death, remarriage, or cohabitation by Wife in a marriage like relationship." The parties then went their separate ways, and husband paid his monthly spousal support as ordered (or so everyone thought).

**{¶3}** In 2018, wife went out on a few dates with Brian Acree, but no romantic relationship blossomed between the two from these encounters, and the parties lost touch. Wife testified that both she and Mr. Acree were grieving at the time, as he had recently lost his wife and she had recently lost her son, which did not put them in the best position to maintain a romantic connection with one another.

**{¶4}** A series of health challenges would ultimately reunite wife and Mr. Acree. Two years after the divorce, in 2019, wife's Non-Hodgkin's Lymphoma became metastatic, spread, and required major surgery. Her daughter Hailey cared for her after this surgery, as she needed assistance to change her bandages and perform other various tasks. Unfortunately, conditions worsened from this point.

**{¶5}** In 2020, the lymphoma spread to her bladder, which required 24 rounds of chemotherapy. At this point, wife went to Facebook to ask for prayers from her friends, and Mr. Acree responded to her post, telling her that he would help in any way that he could. From there, the pair reconnected as friends. Mr. Acree allowed wife to stay on his couch after her chemotherapy treatments, as she needed supervision. Wife's health problems continued, including a bladder procedure in early 2021 and a ruptured hematoma on her abdominal wall in July of that same year. The severity of these issues required wife to take off from work for seven weeks and have full-time care. With both of her daughters working and no other family nearby, Mr. Acree was the only person that wife could turn to for assistance.

**{¶6}** Prior to wife's July 2021 hematoma rupture, she moved into Mr. Acree's apartment and signed a lease with him in May 2021. From early 2021 to early 2023, Betsy, one of wife and husband's daughters, stayed with Mr. Acree and her mother periodically. She testified that the pair slept in the same bed during one of her extended stays, which was around the same time that wife's health worsened.

**{¶7}** In late 2021, husband moved to modify his spousal support, alleging that wife was "cohabitating" with Mr. Acree, which he discovered after hiring private investigators. Subsequent to that motion, in early 2022, wife filed her own motion for contempt and attorney's fees, alleging that husband failed to pay his Tier II spousal support between 2017 and 2022, amounting to almost $96,000 in unpaid support. Thereafter, husband withdrew his original motion and filed a new motion, but he still sought to modify or terminate spousal support.

**{¶8}** The magistrate first heard wife's motion and granted it, finding that husband did indeed fail to pay $95,841.80 in Tier II spousal support and ordering him to pay for wife's attorney's fees in bringing the motion. Husband began paying those sums in accordance with the magistrate's order during the pendency of his motion.

**{¶9}** After several months of waiting, the magistrate finally heard husband's motion, and at the hearing, both husband and wife, Mr. Acree, the divorced couple's two daughters, and the private investigators testified. Wife, Mr. Acree, and the two daughters all testified that the pair did in fact live together, they would spend some holidays and birthdays with each other's families, they would attend Mr. Acree's grandson's sporting events together, and they went on two vacations together—one to Florida and one on a cruise. But no one could testify that the pair were ever physically intimate with one another, that they ever showed any public displays of affection, or that they ever held themselves out as a couple to others. Furthermore, Betsy, wife, and Mr. Acree testified that wife and Mr. Acree actually split their bills and would "even them out" every month.

**{¶10}** The magistrate ultimately denied husband's motion and held that wife was not cohabitating with Mr. Acree, and thus, she was not financially supported by or supporting him. The magistrate accordingly refused to disturb the award of spousal

4

support. Husband objected to the magistrate's findings, but the trial court adopted the decision. Husband now appeals to this court, asserting three assignments of error, arguing that the trial court erred in holding that wife and Mr. Acree's relationship did not rise to the level of consortium, that the pair were not financially intertwined (thus, not cohabitating), and that his failure to pay the Tier II spousal support created any necessity of cohabitation on wife's part.

II.

{¶11} We consider husband's first two assignments of error together, as both challenge the findings and conclusions of the trial court related to cohabitation. Husband maintains that the trial court erred when it held that the facts did not support a finding of consortium, and similarly that wife and Mr. Acree's relationship did not rise to the level of cohabitation as it pertained to the financial relationship between the two.

{¶12} Both of these determinations present quintessential factual questions concerning the nature of the parties' relationship. We typically review a trial court's decision on modification or termination of spousal support under an abuse of discretion standard, "'determin[ing] whether the trial court acted unreasonably, arbitrarily, or unconscionably.'" *Smith v. Smith*, 2015-Ohio-2258, ¶ 21 (1st Dist.), quoting *Brandner v. Brandner*, 2012-Ohio-3043, ¶ 12 (12th Dist.). But whether one party is "cohabitating" with another individual (warranting a reduction or termination of spousal support) presents "a question of fact for the trier of fact." *Reid v. Reid*, 2023-Ohio-3140, ¶ 19 (6th Dist.), citing *Moell v. Moell*, 98 Ohio App.3d 748, 752 (6th Dist. 1994). In reviewing such factual questions, if a finding of cohabitation "is supported by some competent, credible evidence [it] will not be reversed by a reviewing court as against the manifest weight of the evidence." *Prokopchuk v.*

5

*Prokopchuk*, 2012-Ohio-4480, ¶ 16 (5th Dist.), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978). "A manifest weight of the evidence challenge 'concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *Delgado v. Delgado*, 2018-Ohio-4938, ¶ 23 (12th Dist.), quoting *Baird v. Crop Prod. Servs. Inc.,* 2012-Ohio-4022, ¶ 17 (12th Dist.).

{¶13} As we scan the landscape of caselaw on this point, we see a variety of standards that Ohio appellate courts apply when considering the issue of cohabitation. Some courts consider the criminal standard for determining cohabitation, where "the essential elements . . . [are] (1) the sharing of familial or financial responsibilities and (2) consortium." *Annenberg v. Annenberg*, 2015-Ohio-2115, ¶ 16 (1st Dist.), citing *State v. Williams*, 79 Ohio St.3d 459, 465 (1997); *see Mengel v. Mengel*, 2021-Ohio-4166, ¶ 14-16 (5th Dist.) (the court cited the *Williams* standard and analyzed the facts that supported a finding that the relationship rose to the level of consortium (the couple's sexual and romantic relationship, their sharing of the master bedroom, their affection for one another, etc.)); *see also Fox v. Fox*, 2014-Ohio-1887, ¶ 27-31 (12th Dist.) (the court cited the *Williams* standard alongside the financial relationship between the parties).

{¶14} Other courts strictly consider "whether the ex-spouse and paramour have 'assume[d] obligations, including support, equivalent to those arising from a ceremonial marriage.'" *Annenberg* at ¶ 19, quoting *Geitz v. Geitz*, 1999 Ohio App. LEXIS 2351 (4th Dist. May 20, 1999); *see Schmidt v. Schmidt*, 2000 Ohio App. LEXIS 5880, *14-15 (8th Dist. Dec. 14, 2000) (the court specifically declined to adopt the *Williams* standard in favor of a standard that focuses on the financial relationship between the two). And in considering this, the nature of spousal support is the guiding

6

principle. *See Clark v. Clark*, 2006-Ohio-4820, ¶ 22 (11th Dist.) (the court noted how the Supreme Court defined "cohabitation" in *Williams* but held that the nature of spousal support requires a finding of financial support between the two individuals cohabitating); *see Reid* at ¶ 19 (the court held that the financial relationship between the individuals was paramount to whether they were cohabitating).

{¶15} On top of both of those approaches, courts may also simultaneously consider whether there was "'(1) an actual living together; (2) of a sustained duration; and (3) with shared expenses with respect to financing and day-to-day incidental expenses.'" *Moell*, 98 Ohio App.3d, at 752 (6th Dist. 1994), quoting *Dickerson v. Dickerson*, 87 Ohio App.3d 848, fn. 2 (6th Dist. 1993).

{¶16} On this record, however, we need not resolve the tension between these standards, because, regardless of the applicable standard, the trial court here made clear factual findings that husband did not meet his burden of proof. Specifically, the trial court found that the evidence did not indicate "that the relationship amount[ed] to more than a platonic friendship," it did not find "that either [wife] is supporting [Mr.] Acree or that [Mr.] Acree is financially supporting [wife]," and it found that the relationship "amount[ed] to nothing more nefarious than two roommates reducing expenses by sharing a residence." Plugging those factual findings into any of the standards above would compel the same answer.

{¶17} The question thus becomes whether husband can demonstrate that these factual findings were against the manifest weight of the evidence. In a word, no. To be sure, husband presented some circumstantial evidence of cohabitation—that wife lived with Mr. Acree, at some points they slept in the same bed, and that they took some vacations together and attended some events together. But this myopic view fails to take into account the broader picture of the relationship that wife developed in

the evidentiary hearing.

**{¶18}** Evidence showed that the parties split monthly expenses between the two of them, as they would "even out" their expenses every month (much like a typical roommate relationship). Wife would pay the cable and grocery bills, and she paid for the cruise on her credit card, while Mr. Acree paid the rent and other various utilities. Testimony and evidence showed that if there were any major discrepancies in the expenses at the end of each month, wife would pay Mr. Acree more money or vice versa. Beyond that, wife independently paid her other expenses, such as her gym membership, her renter's insurance, and her car insurance and payments. She did not help Mr. Acree pay for his own independent expenses.

**{¶19}** Additionally, the pair denied that they were ever intimate with each other, and no one else testified that they were nor did any evidence demonstrate that they had such a relationship. Furthermore, both of husband and wife's daughters and the private investigators testified that they never saw the pair show any public displays of affection towards one another. No one was able to testify that the pair held themselves out as a couple to larger society. In fact, wife testified that when Mr. Acree's daughter introduced them to others, she would introduce them as "my father and his friend." When they went on vacations with one another, they spent time apart doing their own activities, and there is no evidence that they slept in the same bed, as wife testified that on the cruise, there were two beds.

**{¶20}** While the pair did share a bed at one point, they did so during wife's battles with her health. Mr. Acree had an adjustable bed, which was able to support wife with her restricted mobility. Additionally, at that time, she needed assistance at night in order to go to the bathroom and change her bandages. Betsy (the daughter) further testified that when she stayed at the apartment at a later date, her mother slept

on the couch.

**{¶21}** So, while there is some evidence supporting husband's position, he has failed to demonstrate that the trial court botched the critical factual determination—that wife and Mr. Acree are in a nonromantic relationship as roommates. The trial court saw two people struggling with financial and health issues that decided to be roommates in order to share and reduce expenses. We, as the appellate court, need something compelling us to find such a decision against the manifest weight of the evidence, and husband's evidence falls well short. The record, on the whole, amply supports the trial court's conclusions.

**{¶22}** Because husband has failed to demonstrate how the trial court's judgment was against the manifest weight of the evidence, we overrule his first two assignments of error.

III.

**{¶23}** In his third assignment of error, husband argues that the trial court erred when it found that it was necessary for wife to cohabitate with Mr. Acree because husband failed to pay his Tier II spousal support. However, this assignment misunderstands the nature of the trial court's determination. The trial court never found (explicitly or implicitly) that it was necessary for wife to cohabitate with Mr. Acree. After all, the trial court's judgment rested on the finding that the pair were *not* cohabitating. Because the trial court never explicitly found that there was any necessity on wife's part to cohabitate with Mr. Acree due to husband's failure to pay his Tier II support, we overrule husband's third assignment of error.

\* \* \*

**{¶24}** Based on the foregoing reasons, we overrule all three of husband's assignments of error and accordingly affirm the trial court's judgment on all grounds.

9

Judgment affirmed.

**ZAYAS, P.J.,** and **WINKLER, J.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.